**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| JAVIER GOMEZ, et al., | § | |
| | § | |
| Plaintiffs, | § | |
| vs. | § | **NO. 3:14-cv-2934-L** |
| | § | |
| MI COCINA LTD, et al., | § | |
| | § | |
| Defendants. | § | |

**DEFENDANTS' MOTION FOR DECERTIFICATION
OF CONDITIONALLY CERTIFIED COLLECTIVE ACTION
AND BRIEF IN SUPPORT**

Defendants Mi Cocina Ltd., M Crowd GP, LLC, M Crowd Restaurant Group, Inc., Mercury Grill, Ltd., and Mi Cocina, LLC (collectively, "Defendants") file this Motion for Decertification of Conditionally Certified Collective Action, and respectfully show as follows:

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION AND SUMMARY OF ARGUMENT ............................................... 1

II.   PROCEDURAL AND FACTUAL BACKGROUND ........................................................ 4

    A.    Conditional Certification and Subsequent Discovery ............................................ 4

    B.    Defendants' Policies Are Lawful on Their Face and Do Not Provide a
    Basis for Adjudication of Class Claims ................................................................. 6

    C.    Class Members' Factual and Employment Settings Vary Widely ......................... 6

        1.    Working off the clock ............................................................................... 7

        2.    Class worked in different jobs and under different compensation
        systems ...................................................................................................... 8

        3. Not all class members participated in Defendants' lawful tip pools ............... 10

III.  ARGUMENT AND AUTHORITY ............................................................................. 11

    A.    Plaintiffs Cannot Meet Their Stringent Burden at the Decertification Stage ...... 11

    B.    Disparate Employment Settings and Individualized Defenses Require
    Decertification ..................................................................................................... 13

        1.    Discovery shows that claims for "off-the-clock" work,
        "cleaning/sidework" and "time-shaving" are not uniform or
        consistent among the class ...................................................................... 13

            a.    Factual dissimilarities abound concerning alleged "off-the-
            clock" work .................................................................................. 13

            b.    Defendants must defend "off-the-clock" and time-shaving
            claims on an individual basis ....................................................... 17

            c.    "Excessive sidework" claims rely on differing individual
            facts .............................................................................................. 19

            d.    "Excessive sidework" allegations are subject to individual
            defenses ....................................................................................... 22

        2.    Plaintiffs' "tip credit" allegations are divergent, do not apply at all
        to many class members, and have limited application to other class
        members ................................................................................................... 24

            a.    Disparate employment circumstance make the Named
            Plaintiffs' "tip credit" claims unrepresentative of the class ......... 24

            b.    "Tip credit" disparities give rise to individualized defenses
            to minimum wage claims ............................................................. 27

        3.    Discovery shows factual disparity as to "overtime" and "minimum
        wages" ..................................................................................................... 31

# TABLE OF CONTENTS
### (continued)

**Page**

a.  The Named Plaintiffs' claims differ from many Opt-Ins who have worked little or no overtime, or have always been paid minimum wage ................................................................... 31

b.  Differences in hours worked and pay rates lead to individualized defenses .............................................................. 33

4.  Discovery reveals no "improper deductions," much less a systematic practice causing classwide FLSA violations ......................... 34

a.  Most Opt-Ins deny ever having any "deductions" taken ............. 34

b.  Even if haphazard "deductions" occurred, defenses are still individualized ............................................................... 36

5.  "Improper notice" of intent to take tip credits cannot be decided collectively ........................................................................ 36

a.  Facts regarding "notice" are inconsistent and individualized ...... 36

b.  Individual defenses rebut Plaintiffs' "lack of tip credit notice" claims .................................................................. 37

6.  Alleged timing issues create factual disparities and individualized defenses ........................................................................... 37

a.  Timing of alleged violations varies among class members ......... 37

b.  Timing issues give rise to individualized defenses ..................... 38

7.  Rare actions surviving decertification are distinguishable ..................... 39

8.  Manager-specific allegations of conduct contrary to an employer's policy means the class members are not connected in a uniform way ................................................................................... 41

C.  There is No Fair or Procedurally Proper Way to Try This Action on a Collective Basis Without Violating Defendants' Due Process Rights ................ 42

IV.  CONCLUSION ............................................................................ 50

# TABLE OF AUTHORITIES
## (Continued)

Page

CASES

*Basco v. Wal-Mart Stores, Inc.*,
2004 WL 1497709 (E.D. La. July 2, 2004) ...................................................................14, 17

*Briggins v. Elwood TRI, Inc.*,
882 F. Supp. 2d 1258 (N.D. Ala. 2012)........................................................................12, 14

*Desilva v. N. Shore-Long Island Jewish Health Sys., Inc.*,
27 F. Supp. 3d 313 (E.D.N.Y. 2014) ..................................................................................45

*Dole v. Continental Cuisine, Inc.*,
751 F. Supp. 799 (E.D. Ark. 1990).....................................................................................29

*Douglas v. First Student, Inc.*,
888 F. Supp. 2d 929 (W.D. Ark. 2012)...............................................................................14

*England v. New Century Fin. Corp.*,
370 F. Supp. 2d 504 (M.D. La. 2005).................................................................................14

*Espenscheid v. DirectSat USA, LLC*,
706 F.3d 770 (7th Cir. 2013) ..............................................................................................47

*Falcon v. Starbucks*,
580 F. Supp. 2d 528 (S.D. Tex. 2008) ...........................................................................39, 40

*Fast v. Applebee's Int'l, Inc.*,
2010 WL 816639 (W.D. Mo. Mar. 4, 2010), *aff'd*, 638 F.3d 872 (8th Cir.
2011) ...............................................................................................................................20, 22

*Hinojos v. Home Depot, Inc.*,
2006 WL 3712944 (D. Nev. Dec. 1, 2006)..........................................................................18

*Ide v. Neighborhood Rest. Ptnrs., LLC*,
32 F. Supp. 3d 1285 (N.D. Ga. 2014) .................................................................................36

*In re Chevron U.S.A., Inc.*,
109 F.3d 1016 (1997)...........................................................................................................43

*Johnson v. Big Lots Stores, Inc.*,
561 F. Supp. 2d 567 (E.D. La. 2008)........................................................................ *passim*

# TABLE OF AUTHORITIES
## (Continued)

Page

*Johnson v. TGF Precision Haircutters, Inc.*,
  2005 WL 1994286 (S.D. Tex. Aug. 17, 2005) ...........................................................14, 26, 41

*Jonites v. Exelon Corp.*,
  522 F.3d 721 (7th Cir. 2008) .............................................................................................12

*Kilgore v. Outback Steakhouse*,
  160 F.3d 294 (6th Cir. 1998) ............................................................................................36

*Lundy v. Catholic Health Sys.*,
  711 F.3d 106 (2d Cir. 2013)..............................................................................................13

*Mathis v. Darden Rests.*,
  2014 WL 4428171 (S.D. Fla. Sept. 1, 2014) ............................................................... *passim*

*Monahan v. County of Chesterfield*,
  95 F.3d 1263 (4th Cir. 1996) ............................................................................................27

*Monger v. Cactus Salon & Spa's, LLC*,
  2009 WL 1916386 (E.D.N.Y. July 6, 2009)......................................................................27

*Mooney v. Aramco Services Co.*,
  54 F.3d 1207 (5th Cir. 1995) ............................................................................................12

*Murray v. Stuckey's Inc.*,
  939 F.2d 614 (8th Cir. 1991) ........................................................................................33, 44

*Myers v. Copper Cellar*,
  192 F.3d 546 (6th Cir. 1999) ............................................................................................30

*Pellon v. Bus. Rep. Int'l., Inc.*,
  528 F. Supp. 2d 1306 (S.D. Fla. 2007), *aff'd*, 2008 U.S. App. LEXIS 19077
  (11th Cir. Sept. 3, 2008)....................................................................................................36

*Prise v. Alderwoods Group, Inc.*,
  817 F. Supp. 2d 651 (W.D. Pa. 2011).................................................................................43

*Proctor v. Allsups Convenience Stores, Inc.*,
  250 F.R.D. 278 (N.D. Tex. 2008) .................................................................................. *passim*

*Pullen v. McDonald's Corp.*,
  2014 WL 4610296 (E.D. Mich. Sept. 15, 2014)...................................................................34

*Reed v. Cty. of Orange*,
  266 F.R.D. 446 (C.D. Cal. 2010) .......................................................................................44

## TABLE OF AUTHORITIES
### (Continued)

Page

*Reyes v. Texas Ezpawn, L.P.*,
  2007 WL 101808 (S.D. Tex. Jan. 8, 2007) .............................................................45

*Rindfleisch v. Gentiva Health Servs., Inc.*,
  22 F. Supp. 3d 1295 (N.D. Ga. 2014) ...................................................18, 28, 33

*Roussell v. Brinker*,
  2008 WL 7835721 (S.D. Tex. Sept. 30, 2008) ...............................................41, 45

*Roussell v. Brinker*,
  2009 WL 6496504 (S.D. Tex. Jan. 26, 2009) ...........................................41, 48, 49

*Roussell v. Brinker Int'l., Inc.*,
  441 F. App'x 222 (5th Cir. 2011) .....................................................................12, 49

*Rudy v. Consol. Rest. Cos., Inc.*,
  2010 WL 3565418 (N.D. Tex. Aug. 18, 2010) ...............................................29, 36

*Salinas v. O'Reilly Auto., Inc.*,
  2005 WL 37835986 (N.D. Tex. Nov. 17, 2005) .....................................................41

*Sargent v. HG Staffing, LLC*,
  171 F. Supp. 3d 1063, 1077 (D. Nev. 2016) ...................................................13, 47

*Schaefer v. Walker Bros. Enterps.*,
  829 F.3d 551 (7th Cir. 2016) ...........................................................................23, 36

*Sheffield v. Orius Corp.*,
  211 F.R.D. 411 (D. Or. 2002) ................................................................................11

*Strange v. Wade*,
  2010 WL 3522410 (S.D. Ohio Sept. 8, 2010) .......................................................29

*Trejo v. Ryman Hosp. Props., Inc.*,
  795 F.3d 442 (4th Cir. 2015) .................................................................................27

*U.S. v. Klinghoffer Bros. Realty Corp.*,
  285 F.2d 487 (2d Cir. 1960)...................................................................................27

*White v. 14051 Manchester Inc.*,
  301 F.R.D. 368 (E.D. Mo. 2014) ...........................................................................47

*Wilson v. Navika Capital Group, Inc.*,
  2014 WL 2534904 (S.D. Tex. June 4, 2014)..........................................................47

# TABLE OF AUTHORITIES
### (Continued)

**Page**

*Zivali v. AT&T Mobility, LLC,*
    784 F. Supp. 2d 456 (S.D.N.Y. 2011) ....................................................................................14

**STATUTES**

Fair Labor Standards Act ........................................................................................ *passim*

**OTHER AUTHORITIES**

29 C.F.R. § 531.35 ........................................................................................................29

29 C.F.R § 531.56(e) ................................................................................................20, 22

## I.   INTRODUCTION AND SUMMARY OF ARGUMENT

There are only two circumstances where a collective action is proper: if there is an express policy that Plaintiffs claim is illegal and impacted the entire class in the same way, or alternatively, if the entire class has a common experience that makes class determination of a particular practice triable. Because neither circumstance exists here, this class is unsustainable, and Plaintiffs cannot have their claims determined in a collective action.

Although this is a factually intricate case, it can be described in simple terms. Employers have two obligations under the Fair Labor Standards Act ("FLSA"): (1) to pay employees time and a half for hours worked over 40 in a workweek; and (2) to ensure that employees receive wages each week that are, on the average, equal to the minimum of $7.25 per hour worked. Plaintiffs claim that Defendants have failed to meet these obligations for every "tipped" worker in every workweek since August 15, 2011. In making this sweeping allegation, Plaintiffs have articulated eight theories (some with multiple variations) as to how all tipped employees have been unlawfully deprived of overtime and minimum wages:

> (1) were not paid for all hours worked; (2) were not provided overtime pay for hours worked in excess of forty hours per week; (3) were required to work during their breaks; (4) were required to work off the clock or for $2.13 per hour "to do deep cleaning outside of their normal responsibilities;" (5) had cash deducted from earned tips to cover non-paying customers, broken items, or register shortages; (6) were required to "participate in a tip pool" for which waitresses and waiters, contributing 3% of their tips to be distributed to bartenders, bus staff, and hostesses, as well as to management and "other ineligible employees;" (7) had a percentage of credit card tips taken to cover transaction costs charged by credit card companies; and (8) were not given notice that Defendants intended to take a "tip credit" against minimum wages. *See* Order, Dkt. No. 123.

In granting conditional certification, the Court noted that Plaintiffs "carried their lenient burden for conditional class certification" and that Defendants' concerns with the many factual differences among the putative class were "better addressed in the context of decertifying the

conditional class at a later time if the concerns persist as discovery progresses." Order, Dkt. No. 123 at 9. Now that discovery is over, the concerns still persist, but Plaintiffs' burden to maintain this action as a collective one is no longer "lenient." It is evident that collective treatment will only result in varied claims asserted by individuals having little or no factual connection.

Despite Plaintiffs' conclusory characterizations, discovery has not revealed any "policies" maintained by Defendants that are unlawful. The allegations, more appropriately categorized as alleged "*de facto* policies," are mere constructs of Plaintiffs' argument, not the evidence. Discovery has shown that these purported "policies" are really just the amalgamation of disparate individual grievances. Individual fact findings and legal conclusions will inevitably dominate the case and make impossible a determination of any common facts or legal issues. Plaintiffs have not and cannot propose a trial plan that would be anything other than an unmanageable mess in order to unsort all of the divergent facts, claims, and defenses.

The five Named Plaintiffs all worked as servers at one Dallas restaurant, the Mi Cocina-West Village; the class, however, now includes 296 others individuals who recorded time as servers, bartenders, bussers, hostesses, and cocktails servers (among many other titles) at 21 Mi Cocina locations, seven Taco Diner locations, and one The Mercury, variously located in Texas, Oklahoma, Georgia, and Maryland. Whether one or more of the Plaintiffs possess a meritorious claim based on their own experience is not the present issue, because there is no basis to extrapolate the experiences of one person or even several people to the whole class. Rather, the issue is whether <u>all</u> servers, bussers, hostesses, bartenders, and cocktail servers are similarly situated, and the evidence shows that they are not.

A manageable trial plan—which Plaintiffs lack—is a must in order for this case to move forward as a collective action. Plaintiffs stack eight different allegedly unlawful "practices" on

top of one another, and these alleged practices implicate both minimum wage and overtime claims. Plaintiffs then layer the allegations about these eight practices over five distinct job titles and pay systems for 301 individuals with markedly different experiences and circumstances. If this alone was not enough to show that there can be no manageable trial plan, the inappropriateness of collective treatment becomes even more clear when one considers the factual impossibility that all class members have experienced the same violations, much less systematically, since August 2011.

Although the following will be described in more detail below, here is a brief summary of why there is no manageable plan to try these layered individualized and disparate experiences: First, although Plaintiffs allege Defendants required them to perform work "off the clock" (by a variety of different means), numerous Opt-Ins have admitted that they did not work off the clock; their payroll hours recorded were accurate; they never took "breaks" at all; or any breaks taken were "on the clock" and were paid. Thus, there is no consistency to the claims of "off-the-clock" work or the frequency, quantity of time involved, reasons for the work, or supervisor directives. Second, Plaintiffs claim that the "tip credit" was taken improperly against minimum wages for multiple reasons. However, these "tip credit" claims are not susceptible to classwide treatment because for every theory put forward, there are class members for whom the experience is not a shared one. Third, Plaintiffs claim to have been deprived of minimum wages as a result of an improper "deductions" policy. But, again, the experience is not common to the whole class. In fact, discovery shows virtually no Plaintiff has had this experience. Fourth, Plaintiffs claim they should recover for "unpaid overtime." Plaintiffs' problem, as a class, is that its members routinely admit they never, or rarely, worked overtime, or admit they were paid for all hours properly.

The lack of a uniform policy affecting all class members and lack of a common experience among the class members is the only thing tying this class together. The untenable nature of the "collective" is underscored by Plaintiffs' lack of any person or evidence capable or addressing liability or damages on a class basis, rather than an individual one. Without a cohesive trial plan, no fair trial can be had on a representative basis. Because Plaintiffs cannot shows the class is "similarly situated," it must now be decertified.

## II.    PROCEDURAL AND FACTUAL BACKGROUND

### A.    Conditional Certification and Subsequent Discovery

The Class. On March 4, 2015, Judge Solis conditionally certified a collective action that included all servers and cocktail servers, bartenders, hostesses, and bussers who worked at any Mi Cocina, Taco Diner, or The Mercury restaurant since August 15, 2011. Besides the five Named Plaintiffs, 349 other individuals opted into this lawsuit (the "Opt-Ins"). Among those, 53 Opt-Ins have been dismissed, leaving 301 members in the present class.[1]

Discovery Undertaken. Defendants obtained written discovery from the five Named Plaintiffs, and the Court granted Defendants leave to obtain limited written discovery (five requests for admission and interrogatories) from 20 percent of the Opt-Ins (63 individuals). *See* Order, Dkt. No. 363. Only 20 of the 63 Opt-Ins provided written answers within the time permitted by the Federal Rules of Civil Procedure. Of the remaining 43, 10 never provided any answers, and 33 Opt-Ins did not demonstrate any cause for their failure to answer on time.[2] Thus,

---

[1] *See* Dkt. No. 572 (granting Defendants' motion for partial summary judgment, dismissing 49 Opt-Ins); Dkt. No. 541 (Stipulation of Dismissal of four Opt-Ins).

[2] *See* Order, Dkt. No. 455 (denying Plaintiffs' motion to withdraw deemed admissions). The 43 Opt-Ins failing to timely answer requests for admission and now deemed to have admitted all requested facts are: Aguilar, J.; Aguilera, E.; Aguinaga, M.; Aguirre, M.; Alarcon, E.; Alcaraz, M.; Barron, K.; Blake, J.; Bonilla Romero, S.; De Haro, A.; Delgado, O.; Dominguez, L.; Dominguez, C.; Elydrissi, A.; Escobedo, B.; Gross, J.; Guerrero, V.; Gurevich, D.; Hernandez, Esm.; Irineo, H.; Jackson, M.; Kifer, W.; Kleeb, N.; Knitch, A.; Knox, H.; Laguna, M.; Lopez, I.; Lopez Diaz, G.; Loya, O.; McCallum, C.; Neal, C.; Novy, A.; Nwaohia, E.; Ortiz, F.; Romero, E.; Sanchez, A.; Stern, M.;

over two-thirds of the written discovery sent to Opt-Ins resulted in—at least on an individual basis—the conclusive establishment of five material facts that do not support collective disposition. Those facts, relative to the period from August 15, 2011, to the present, are:

(1) the hours reflected on those plaintiffs' paystubs accurately reflect the total number of hours they have actually worked;

(2) those plaintiffs have not made a complaint to supervisor(s) or manager(s) about not being paid for time worked;

(3) those plaintiffs have not had any money withheld from their wages or tips for "dine and dash," breakage, or cash register shortage;

(4) the plaintiffs have not participated in a tip-sharing arrangement about which they have specific, personal knowledge of managers or other non-tipped employees receiving funds; and

(5) no supervisor or manager has provided those plaintiffs with written or verbal instructions to perform work without being clocked in.[3]

The Court denied Plaintiffs' motion to withdraw the deemed admissions of the 33 Opt-Ins providing late answers.[4] The Court permitted Defendants to depose the five Named Plaintiffs and up to seven percent of Opt-Ins. *See id.* Ultimately, Defendants deposed 19 Opt-Ins, and noticed 15 other Opt-Ins failing to appear, including after the entry of several Court orders compelling depositions.[5] Plaintiffs took no depositions and have not disclosed any expert witnesses.

**B.   Defendants' Policies Are Lawful on Their Face and Do Not Provide a Basis for Adjudication of Class Claims**

Newly-hired employees receive copies of Defendants' personnel handbooks,[6] which

---

Talamantes, I.; Thomas, M.; Urieta, N.; Valenciano, J.; Vera, J.; and Vidales, P.
[3] Elliott Decl. ¶¶ 3-4, APP 0188-192.
[4] Plaintiffs' objections to Magistrate Judge Ramirez's order denying their motion to withdraw deemed admissions remains pending. *See* Dkt. No. 440 *Pltfs.' Emergency Motion to Withdraw or Amend Deemed Admission.*
[5] Elliott Decl. ¶ 8, APP 0192-193. Defendants noticed depositions for the following Opt-Ins who did not appear: Anayeli Sanchez, Jose Gaytan, Haile Keegan, Heidi Knox, Jose Morales, Victor Valles, Pedro Alvarez, Brenda Escobedo, William Kifer, Destiny Saucedo, Adan Reyes, Luis Urrutia, Kandy Galvan, Juan Mendez, and Alfredo Posadas. *Id.*
[6] Barron Dep. 42:23-43:10, APP 3020; Castaneda Dep. 39:24-40:1, APP 3104; Roberts Dep. 42:1-15, APP 3385.

contain relevant personnel policies about recording work hours and overtime:

- "[H]ourly Employees must record all hours worked"
- "No work is to be performed without first clocking in"
- "Employees are not to clock out until all work has been completed"
- "Any employee who is asked by Management to work off-the-clock should immediately contact the Department of Human Resources"
- "Under no circumstances should an Employee perform any work or duties 'off-the-clock.' Doing so is considered a serious violation of Company policy"[7]

Defendants' policies prohibit <u>all</u> "off-the-clock" work, and permit recorded time to be altered only to ensure that actual work hours are recorded accurately (such as inputting a clock-in or clock-out time if the server forgot to timely record his clock-in or clock-out time).[8] Far from prohibiting or discouraging overtime, policies specifically recognize that "employees may be <u>expected</u> to work reasonable amounts of overtime [and] will be paid overtime compensation in accordance with applicable state and federal laws."[9] Several Plaintiffs and Opt-Ins confirm that overtime is permitted and not discouraged.[10] Local management has the discretion to manage the scheduling or working of overtime according to the needs of each restaurant location.[11]

## C.    Class Members' Factual and Employment Settings Vary Widely

### 1.    Working off the clock

Central to Plaintiffs' case is the claim that Defendants required all class members to work "off the clock," and the five Named Plaintiffs each contend that extensive, daily "off-the-clock" work was required (up until this suit was filed).[12] Experiences of the class differ, however:

---

[7] McAfee Decl., APP 0017; Mi Cocina/Taco Diner Handbook, p. 16, APP 0050, 0052, 0058.
[8] McAfee Decl., APP 017, Mi Cocina/Taco Diner Handbook, p. 16, APP 0050, 0052, 0058.
[9] McAfee Decl., APP 017, Mi Cocina/Taco Diner Handbook, p. 16, APP 0050, 0052, 0058.
[10] Castaneda Dep. 40:11-13, APP 3104; Flores Dep. 36:3-10, 3125; A. Huerta Dep. 197:14-18, 3268; Loma Dep. 59:17-20, APP 3302; Roberts Dep. 39:25-40:2, APP 3384; Sabillon Dep. 102:4-103:13, APP 3478; Salamat-Talab Dep. 19:18-20:1, APP 3492.
[11] McAfee Decl. ¶ 44, APP 0018.
[12] Gomez Dep. 158:18-21, APP 3173; Merino Dep. 117:11-118:21, APP 3345; 126:7-11, APP 3347; A. Huerta Dep.

among the 19 deposed Opt-Ins, at least five affirmatively deny having <u>ever</u> worked off the clock:

- **Seth Brenes** (Mi Cocina-Legacy): "I always clocked in before starting work."
- **Myriam Flores** (Mi Cocina-Highland Park): Q: "Are there any times that you can remember that you were working when you weren't clocked in?" A: "No, I don't believe so."
- **Christy Neal** (Mi Cocina-Alliance): Q. "…during your employment you do not recall having to personally work off the clock; is that correct?" A: "Yes."
- **Kevin Sabillon** (Preston Forest and Highland Park Mi Cocina locations): "I was never asked to work after I was off the clock? No... that never happened to me, no."
- **Teresa Salamat-Talab** (Mi Cocina-Legacy): "I always made sure I was on the clock when I worked."[13]

Likewise, and in addition to 43 Opt-Ins who have conclusively admitted that their pay records accurately record hours worked,[14] nine other deposed Opt-Ins provided testimony markedly different from the Named Plaintiffs' theory that Defendants policies require "off-the-clock" work:[15]

- **Kevin Barron** did not engage in pre-shift or post-shift work while off-the-clock, and was never instructed to work off the clock, but occasionally performed random tasks off-the-clock between shifts when scheduled for a split shift on Saturdays (although he did not typically work split shifts on Saturdays).
- **Matthew Castaneda** did not perform any off-the-clock when working as a server.
- **Marixa Hernandez** claims that when she arrived for work and the restaurant was busy, she would immediately take a customer's order and clock in right after doing so, but it is "impossible" to say how many times that happened. She does not recall having ever been asked to perform off-the-clock work.
- **Angel Loma** claims he worked off-the-clock for brief periods of time several years ago, but he has not done so within the last three or four years.
- **Jeimmy Romero** once or twice may have worked for 10 to 15 minutes after clocking out, but forgot to inform her manager to correct her time records, and so was not paid.
- **Maria Rodriguez** says that on two occasions in 2015, her manager told she did not

---

143:5-144:7, APP 3254; Bobadilla Dep. 74:7-75:10, APP 3042; U. Rodriguez Dep. 56:8-16, APP 3418.

[13] Brenes Dep. 7:11-18, APP 3088; 15:1-13, APP 3090; 26:1-25, APP 3091; 32:25-33:7, APP 3092-3093; 50:23-51:2, APP 3095; Flores Dep. 8:17-22, APP 3119; 43:23-25, APP 3126; Neal Dep. 11:4-11, APP 3366; 61:6-8, APP 3371; 85:3-6, APP 3376; Sabillon Dep. 21:17-23:19, APP 3470; 30:13-21, APP 3471;73:23-74:4, APP 3475; 89:11-90:5, APP 3476; Salamat-Talab Dep. 9:10-17, APP 3490; 52:23-53:13, APP 3494-3495.

[14] Elliott Decl. ¶¶ 3-7, APP 0188-192 (deemed admissions to RFA No. 1).

[15] M. Hernandez Dep. 24:6-25:19, APP 3192-3193; Barron Dep. 11:8-19, APP 3013; 12:21-13:10, APP 3013-3014; 21:19-24:1, APP 2015; Castaneda Dep. 47:4-9, APP 3016; Loma Dep. 38:14-16, APP 3300; J. Romero Dep. 62:10-64:1, APP 3463; M. Rodriguez Dep. 56:9-58:19, APP 3397; Elydrissi Dep. 105:4-106:22, 3155; Guerrero Dep. 48:14-49:6, APP 3185; Stern Dep. 32:2-33:3, APP 3506-3507.

clean something properly so she would have to go back and clean it after clocking out, and then worked an extra 5 to 10 minutes off-the-clock.

- **Abderrahmane Elydrissi** claims to have worked off-the-clock occasionally at the end of his own shift when other employees did not arrive, but he raised the issue with a manager, and was subsequently paid for all of the off-the-clock work.
- **Maria Guerrero** did not work off-the-clock in her capacity as a hostess, cashier, or expo and cannot quantify any hours allegedly worked off-the-clock as a server.
- **Mike Stern**, a server at The Mercury, stated that he "very rarely" worked off-the-clock and for "no more than 30 minutes" during a two year period.[16]

### 2.    Class worked in different jobs and under different compensation systems

Restaurant employees clock in and out using computer terminals located at the restaurant. They do this by accessing the terminal and selecting the "clock in" function to record the time and "job code" corresponding to the job to be worked during the shift; they use the same system to clock out at the end of a shift.[17] Servers generally only use one job code during a shift, "server," which generally correlates to an hourly rate of $2.13. On the other hand, bussers typically use two different job codes: (1) "busboy," when working during the restaurant's customer service hours, and (2) "cleaner," for hours worked before the restaurant is open and after it is closed.[18] The "cleaner" job code corresponds to a flat hourly rate of $7.25 per hour or more, whereas the "busboy" job code corresponds to $4.25 per hour or more,[19] plus a share of the weekly tip pool. The bartenders in this class using the "bartender" code have earned regular hourly rates ranging from $2.13 per hour to $6.00 per hour, plus tips.[20] Class members using the

---

[16] M. Hernandez Dep. 24:6-25:19, APP 3192-3193; Barron Dep. 11:8-19, APP 3013; 12:21-13:10, APP 3013-3014; 21:19-24:1, APP 2015; Castaneda Dep. 47:4-9, APP 3016; Loma Dep. 38:14-16, APP 3300; J. Romero Dep. 62:10-64:1, APP 3463; M. Rodriguez Dep. 56:9-58:19, APP 3397; Elydrissi Dep. 105:4-106:22, 3155; Guerrero Dep. 48:14-49:6, APP 3185; Stern Dep. 32:2-33:3, APP 3506-3507.

[17] McAfee Decl. ¶ 8, APP 004.

[18] Barron Dep. 11:8-14, APP 301; 21:23-22:7; APP 3015; Castaneda Dep. 10:14-20, APP 3100; 32:15-22; Loma Dep. 18:1-19:5, APP 3298; 33:1-25, APP 3299;48:25-49:5, APP 3301.

[19] McAfee Decl. ¶ 22, APP 011. Opt-In Jose Morales was paid $8.00 per hour under the "busboy" job code as well as the "cleaner" job code and Marguerite Orocio and Maria Llamas Chavez were paid $7.25 per hour for time recorded as "busboy." Pay Records, APP 1575, APP 1657, 1236; Time & Attendance records, APP 2783-2841, APP 2599-2613.

[20] Opt-Ins Felipe Herrera and Adam Morales were paid regular hourly rates of $6.00 and $5.00, respectively, at The

"hostess" code have been paid regular hourly rates more than $7.25 (up to $13.00), plus tips.[21]

There are numerous other job codes outside of the five at issue here, and the regular hourly rates range from $7.25 to $22.00.[22] Some of these other job codes only provide for hourly pay, while other job codes may be receive tips from customers (such as "To-Go" cashier). Unlike the Named Plaintiffs, who, in general, recorded time almost exclusively as "servers," many Opt-Ins recorded time under several other job codes, and often several job codes during the same workweek. The following chart depicts the varying number and type of job codes used and worked during the class period by the deponents:[23]

| Deponent Name | Total Job Codes Used (2011-2015) | Server | FOH Training | Bartender | BOH Training | Busboy | Cashier | CT Server | CT Trainer | Cleaner | Cocktail Waitress | Expo/Runner | Hostess | Manager | Svc. Host Lead | To-Go | Utility |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Job Codes Used 8/15/2011 to 12/31/2015 - By Class Members Deposed | | | | | | | | | | | | | | | | | |
| Bobadilla, Daniel (NP) | 1 | X | | | | | | | | | | | | | | | |
| Gomez, Javier (NP) | 2 | X | X | | | | | | | | | | | | | | |
| Huerta, Alfredo (NP | 3 | X | X | X | | | | | | | | | | | | | |
| Merino, Daniel (NP) | 1 | X | | | | | | | | | | | | | | | |
| Rodriguez, Uriel (NP) | 2 | X | X | | | | | | | | | | | | | | |
| Alcaraz, Maria (Opt-In) | 5 | X | X | X | | | X | | | | | X | | | | | |
| Barron, Kevin (Opt-In) | 3 | | X | | | X | | | | X | | | | | | | |
| Brenes, Seth (Opt-In) | 2 | X | X | | | | | | | | | | | | | | |
| Castaneda, Matthew (Opt-In) | 6 | X | | | X | X | | | | X | | X | | | | | |
| Elydrissi, Abderrahmane (Opt-In) | 2 | X | X | | | | | | | | | | | | | | |
| Flores, Myriam (Opt-In) | 4 | | X | | | | | | | | | X | X | | | X | |
| Guerrero, Maria (Opt-In) | 6 | X | | | | | X | | | | X | X | X | | X | | |
| Hernandez, Marixa (Opt-In) | 4 | X | X | | | | | | | | | X | X | | | | |
| Herrera, Felipe (Opt-In) | 1 | | | X | | | | | | | | | | | | | |
| Loma, Angel (Opt-In) | 4 | | | | | X | | | | X | | X | | | | | X |
| Martinez, Isidoro (Opt-In) | 1 | X | | | | | | | | | | | | | | | |
| Neal, Christy (Opt-In) | 3 | X | X | | | | | | | | | | | | | | X |
| Roberts, Hannah (Opt-In) | 4 | X | X | | | | X | | | | | X | | | | | |
| Rodriguez, Maria (Opt-In) | 5 | X | X | | | | X | | | | | | X | | X | | |
| Romero, Jeimmy (Opt-In) | 5 | X | X | | | | X | | | X | | X | | | | | |
| Sabillon, Kevin (Opt-In) | 6 | X | X | X | | | | X | X | | | X | | | | | |
| Salamat-Talab, Teresa (Opt-In) | 4 | | X | | | | X | | | | | X | X | | | | |
| Stern, Mike (Opt-In) | 1 | X | | | | | | | | | | | | | | | |
| Valdez, Oliverio (Opt-In) | 6 | X | X | X | X | | | | | | | X | | X | | | |

Mercury as bartenders. Pay Records, APP 1042, APP 1534; Time & Attendance records, APP 2546-2572, 2702-21.
[21] *See* McAfee Decl. ¶ 19, APP 0010; Mather pay records, APP 1424; Flores Dep. 29:10-30:8, APP 3124; Salamat-Talab Dep. 9:13-11:20, APP 3490; 13:1-14:12, APP 3491; Romero Dep. 19:12-16, APP 3456.
[22] McAfee Decl. ¶ 11, APP 005, (Time and Payroll records, APP 0066-0186).
[23] APP 2354-2999 (Time & Attendance records for each deposed class member).

DEFENDANTS' MOTION FOR DECERTIFICATION OF CONDITIONALLY CERTIFIED COLLECTIVE
ACTION AND BRIEF IN SUPPORT

### 3.      Not all class members participated in Defendants' lawful tip pools

Employees working under the server job code make contributions to their restaurant's tip pool, and the recipients of the pooled funds, as well as the formulas for allocation of distribution, have varied among different locations. At no time since August 2011 have any tip-sharing systems included "managers" as part of the distribution plan.[24] Servers fund the tip pool with three percent of their net sales, which amount is collected at the end of each shift and is distributed weekly to eligible bussers, hostesses, and bartenders (at some but not all locations), as well as to food runners (The Mercury only).[25] Each restaurant's weekly tip pool is divided into two to four sub-categories (depending on the number of pool-eligible jobs at each respective location), and those shares are then allocated to the employees who have recorded hours in each pool-eligible job code, based on the pro rata percentage of hours worked within each job code.[26] For example, the bar pool received 33.33% of the total tip pool at Mi Cocina-Woodlands, 13.33% at Mi Cocina-Alliance, 10% at 16 Mi Cocina locations, 8.33% at two Taco Diners, and nothing at several other locations.  Hostess and busser participation and shares have also differed among different locations.[27]

## III.      ARGUMENT AND AUTHORITY

### A.      <u>Plaintiffs Cannot Meet Their Stringent Burden at the Decertification Stage</u>

"[T]he burden is on the Plaintiff to prove that the individual class members are similarly situated." *Proctor v. Allsups Convenience Stores, Inc.*, 250 F.R.D. 278, 280 (N.D. Tex. 2008). "Similarly situated" means that there is a "factual nexus which binds the named plaintiffs and the potential class members together as victims of a particular alleged policy or practice." *Id.*

---

[24] McAfee Decl. ¶12-14, APP 0005-0008 (Sample Tip Distribution Records. APP 0020-0035)
[25] McAfee Decl. ¶12-14, APP 0005-0008 (Sample Tip Distribution Records. APP 0020-0035)
[26] McAfee Decl. ¶12-14, APP 0005-0008 (Sample Tip Distribution Records. APP 0020-0035)
[27] McAfee Decl. ¶12-14, APP 0005-0008 (Sample Tip Distribution Records. APP 0020-0035)

"Decertification is proper if the action relates to specific circumstances personal to the plaintiff rather than any generally applicable policy or practice." *Id.* (internal quotations omitted). A collective action should be "an efficient mechanism for resolving a number of disputes [where] individual issues [do not] predominate over collective concerns." *Sheffield v. Orius Corp.*, 211 F.R.D. 411, 413 (D. Or. 2002). A collective action requires "more than a common allegation that [plaintiffs] were denied overtime or paid below the minimum wage." *Id*. If a court cannot "coherently manage the class in a manner that will not prejudice any party," decertification is proper. *Proctor,* 250 F.R.D. at 278. Upon decertification, "the opt-in plaintiffs are dismissed, and the original named plaintiffs may proceed with their own claims only." *Id.* at 280.

Evidence gathered in discovery informs the court's analysis. *Id.*; *see also Mooney v. Aramco Services Co.*, 54 F.3d 1207, 1214 (5th Cir. 1995), *overruled on other grounds by Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003). "[T]he more material distinctions revealed by the evidence, the more likely the district court is to decertify the collective action." *Proctor*, 250 F.R.D. at 281 (quoting *Anderson v. Cagle's, Inc.*, 488 F.3d 945, 953 (11th Cir. 2007)). Unlike the "fairly lenient" standard for conditional certification, the standard for proceeding as a collective action is so high that these actions rarely pass the decertification stage. *Id*. at 280 ("the second stage is much more stringent"); *Mooney*, 54 F.3d at 1214 ("no representative class has ever survived the second stage of review" (at that time)).

Although the Fifth Circuit has not established a legal standard for FLSA certification or decertification, courts generally consider three factors to determine if a class is "similarly situated:" (1) whether there are disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to the defendant which appear to be individual to each plaintiff; and (3) fairness and procedural considerations. *Mooney*, 54 F.3d at 1213, n. 7;

*Proctor*, 250 F.R.D. at 280; *Roussell v. Brinker Int'l., Inc.*, 441 F. App'x 222, at *2 (5th Cir. 2011) (affirming district court's application of "similarly situated" factors in "tip credit" collective action). Where, as here, the facts and claims are "hopelessly heterogeneous," permitting collective adjudication is an "egregious" abuse. *See Jonites v. Exelon Corp.*, 522 F.3d 721, 725-26 (7th Cir. 2008) (holding that it is "preposterous" for plaintiffs to assert that class members lacking a claim can be represented by those that may). When the merits cannot be uniformly determined for the whole class, it is irrelevant that some members may possess valid claims individually. *See Briggins v. Elwood TRI, Inc.*, 882 F. Supp. 2d 1258 (N.D. Ala. 2012) (decertifying where evidence showed that "off-the-clock work sometimes occurs" but because there were "so many variables," both liability and damages would require individual testimony).

**B.     Disparate Employment Settings and Individualized Defenses Require Decertification**

Discovery has shown that there is no allegedly unlawful policy that has affected the class in the same way, and it has also shown how starkly different employment facts and circumstances preclude any uniform determination of the merits. Each distinction about duties, pay structure, hours worked, and management instructions creates an array of individual-specific defenses. Even the most preliminary questions such as what job(s) plaintiffs held, their tip pool participation or being subject to tip-credit wages, off-the-clock work, working overtime, receiving minimum wages, or some combination of these, all require individualized inquiry. *See, e.g., Proctor*, 250 F.R.D. at 282-83 (finding individual differences in existence and amount of "off-the-clock" work, tasks involved, varying practices among stores and managers, and other factors supported decertification).

### 1.   Discovery shows that claims for "off-the-clock" work, "cleaning/sidework" and "time-shaving" are not uniform or consistent among the class

#### a.   Factual dissimilarities abound concerning alleged "off-the-clock" work

The fact that an employee worked "off the clock" is not enough, by itself, to invoke the protections of the FLSA. An FLSA violation occurs only if a worker is deprived of overtime or minimum wages as the <u>result</u> of the "off the clock work." Claims for "straight time wages for unpaid work during pay periods without overtime—are not cognizable under the FLSA[.]" *Sargent v. HG Staffing, LLC*, 171 F. Supp. 3d 1063, 1077 (D. Nev. 2016) (decertifying claim for unpaid straight time); *see also Lundy v. Catholic Health Sys.*, 711 F.3d 106, 116 (2d Cir. 2013).

For many reasons, claims of unwritten policies requiring "off-the-clock" work have been among the least likely to survive a decertification motion because no triable "policy" exists, individual facts tend to diverge, and the legal impact of an unwritten "*de facto*" policy is rarely uniform. *See, e.g., Proctor*, 250 F.R.D. at 284 (decertifying claims alleging that employer's policy required employees to work "off-the-clock" for 1 to 3 hours pre-shift and post-shift upon reaching forty hours in a workweek); *see also Mathis v. Darden Rests.*, 2014 WL 4428171 (S.D. Fla. Sept. 1, 2014) (decertifying "off-the-clock" and "tip credit" collective action claims by restaurant servers); *Johnson v. TGF Precision Haircutters, Inc.*, 2005 WL 1994286 (S.D. Tex. Aug. 17, 2005) (decertifying off-the-clock claims because facts among opt-in plaintiffs were too individualized); *Briggins*, 882 F. Supp. 2d 1256 (decertifying claims of off-the-clock work); *Douglas v. First Student, Inc.*, 888 F. Supp. 2d 929 (W.D. Ark. 2012) (decertifying claims that "extra" unpaid duties were off the clock); *Zivali v. AT&T Mobility, LLC*, 784 F. Supp. 2d 456, 463 (S.D.N.Y. 2011) (decertifying where the "'practices' and 'culture' of which [plaintiffs] complain [were not] sufficiently uniform and pervasive"); *England v. New Century Fin. Corp.*,

370 F. Supp. 2d 504 (M.D. La. 2005) (decertifying off-the-clock claims "because of the different locations, managers, and factual situations involved"); *Basco v. Wal-Mart Stores, Inc.,* 2004 WL 1497709 (E.D. La. July 2, 2004) (holding collective action would be "an exercise in gross mismanagement of judicial and litigant time" where alleged off-the-clock policy was not uniformly or systematically implemented). This case should be decertified for the same reason: no policy requiring off-the-clock work exists.

**Delaying clock-in.**  Plaintiffs argue Defendants had a policy requiring servers not to clock in for opening shifts and to work off the clock until they "got their first table," but discovery shows otherwise.[28] While some of the Named Plaintiffs claim they were required to arrive 30-60 minutes prior to the restaurant opening, start working, but then wait to clock in until the first guest arrived (ending when this lawsuit was filed), at least 11 of the 19 deposed Opt-Ins—all servers—disclaimed this allegation in their depositions. They received no such instruction, and admitted they clocked in before working.[29] Additionally, five other deponents never worked as servers; and, thus, the alleged policy requiring servers to "wait until their first table" has no application to them.[30] Three other deponents testified they were not "instructed" to wait to clock in, but did so to artificially "keep hours low" in order to work more shifts.[31]

**Post-shift cleaning**.  Another alleged unwritten policy concerns the performance of post-

---

[28] *See* Dkt. No. 169, Pltf.'s 3rd Amended Compl. ¶ 17 ("Plaintiffs were told by management not to clock in when they arrived to work, and advised to wait until they were assigned their first table.").

[29] Brenes Dep. 15:1-13, APP 3090; Castaneda Dep. 45:21-46:8, APP 3106; Elydrissi Dep. 54:14-55:14, APP 3110; Guerrero Dep. 44:20-45:21, APP 3184-3185; M. Hernandez Dep. 23:10-18, APP 3192; 26:13-15, APP 3193; Neal Dep. 34:4-9, APP 3368; Roberts Dep. 19:22-20:13, APP 3382; 23:3-25; APP 3383; M. Rodriguez Dep. 51:5-52:11, APP 3396; Romero Dep. 52:1-53:10, APP 3461; Sabillon Dep. 72:5-11, APP 3474; 89:11-90:5, APP 3476; Stern Dep. 30:17-31:3, APP 3503.

[30] Barron Dep. 8:4-9:1, APP 3012; 11:8-19; APP 3013; Flores Dep. 9:22-10:17, APP 3120; 13:12-14:19, APP 3121; 23:9-16, APP 3122; Herrera Dep. 13:2-14:2, APP 3202; 24:10-13, APP 3201; Loma Dep. 14:8-16, APP 3297; 35:5-20, APP 3299; Salamat-Talab Dep. 51:2-7, APP 3494.

[31] Martinez Dep. 64:23-65:20, APP 3312-3313; Alcaraz Dep. 27:24-28:20, APP 3004; Valdez Dep. 46:3-12, APP 3511.

shift "cleaning" but, again, discovery reveals great variations: (1) some were required to clean, off-the-clock, after clocking out at the end of their shift as a server;[32] (2) some stayed clocked in as "servers" to clean, and were paid $2.13 per hour for these cleaning duties;[33] (3) some were not required to "clean" at the end of the shift at all, depending on the job they were working;[34] (4) some rarely or never worked a "closing" shift, and, thus, were not subject to extensive "cleaning" duties at the end of a shift; [35] and (5) for still others, cleaning was a regular part of their jobs as bussers, but it was paid on-the-clock at a regular rate of $7.25 or greater.[36]

Discovery reveals that Opt-Ins lack evidence of substantial off-the-clock work and have no connection to Named Plaintiffs' allegations. Opt-Ins Kevin Sabillon, Kevin Barron, Myriam Flores and Christy Neal were never asked to work "off-the-clock" and recall no off-the-clock work.[37] Seth Brenes and Teresa Salamat-Talab stated, respectively, that "I always clocked in before starting work," and "I always made sure I was on the clock when I worked."[38] Mike Stern recalls no instruction to work off-the-clock and believes that he may have worked off the clock "very rarely" for fewer than 30 minutes.[39] Felipe Herrera was never asked to work off-the-clock, but claims there were occasions where he would have to wait after work because customers had not left.[40] Abderrahmane Elydrissi claims to have sporadically worked off-the-clock, but was

---

[32] Guerrero Dep. 46:3-47:12, APP 3185;

[33] Alcaraz Dep. 40:21-41:1, APP 3007-3008; Castaneda Dep. 36:21-38:17, APP 3103-3104; Neal Dep. 34:10-14, APP 3368; 73:2-74:4, APP 3374;  98:18-25, APP 3377.

[34] Brenes Dep. 26:1-25, APP 3091; Salamat-Talab Dep. 50:13-18, APP 3494;  67:22-68:11, APP 3498; M. Rodriguez Dep. 42:7-9, APP 3394; 46:8-11, APP 3395; 47:8-10, APP 3395.

[35] Elydrissi Dep. 53:20-55:17, APP 3110.

[36] Barron Dep. 9:15-17, APP 3013; 11:8-19, APP 3013.

[37] Barron Dep. 20:24-22:17, APP 3014.1-3015; Flores Dep. 43:23-45:22, APP 3126; Sabillon Dep. 30:13-21, APP 3471; 89:20-90:5; APP 3476; Neal Dep. 61:6-8; APP 3371; 67:12-16, APP 3372; 85:3-6, APP 3376.

[38] Brenes Dep. 15:1-13, APP 3090; 26:9-25, APP 3091; 38:2-6; APP 3094; Salamat-Talab Dep. 53:3-13, APP 3495; 54:1-3, APP 3495.

[39] Stern Dep. 31:24-33:3, APP 3503.

[40] Herrera Dep. 26:14-18, APP 3205; 40:2-24, APP 3206.1.

fully compensated after raising the issue with a manager.[41] Further, despite Plaintiffs' allegation that employees were required to "work through breaks," they testified they did not clock out for breaks, and breaks, if any, were paid "on the clock."[42] In sum, Plaintiffs' contention of a uniform practice requiring "off-the-clock" work is one that is belied by the lack of such a common experience among class members.

**"Shaving" of overtime hours.** Plaintiffs contend that their time records were falsified to deprive them of overtime pay when they were "close to hitting the 40 hour threshold."[43] However, the majority of Opt-Ins deposed denied having a belief (much less evidence) that their hours had been altered.[44] Some reported working overtime and being paid time-and-a-half for it, but most stated that they rarely or never worked overtime at all.[45]

> b.   Defendants must defend "off-the-clock" and time-shaving claims on an individual basis

Defendants possess numerous individualized defenses to Plaintiffs' claim that Defendants had a policy requiring them to work "off the clock." First and foremost, that an individual did not experience "off-the-clock" work, as has been widely admitted,"[46] is an individual issue. Several

---

[41] Elydrissi Dep. 105:4-106:22, APP 3155.

[42] Gomez Dep. 135:1-14, APP 3167 ("I do know that they are paid because they […] wouldn't make us punch out" [for breaks]); Bobadilla Dep. 190:6-7, APP 3071; Huerta Dep. 128:13-129:16, APP 3250.

[43] *See* Dkt No. 169, Pltf's 3rd Amended Compl. ¶17.

[44] Brenes Dep. 35:13-23, APP 3093; 37:3-9, APP 3094; Elydrissi Dep. 92:17-93:5, APP 3113-3114; Flores Dep. 55:22-57:16, APP 3128; 66:19-25, APP 3131; Guerrero Dep. 54:8-11, APP 3187; Loma Dep. 48:9-19; APP 3301; Neal Dep. 61:9-16, APP 3371; J. Romero Dep. 75:12-18, APP 3466; M. Rodriguez Dep. 73:11-74:18; APP 3401; Salamat-Talab Dep. 60:19-61:9, APP 3496-3497; Stern Dep. 33:4-20, APP 3504.

[45] Barron Dep. 12:1-3, APP 3013; 42:10-14, APP 3020; Brenes Dep. 51:3-8, APP 3095; Barron Dep. 12:1-3, APP 3013;  42:10-14, APP 3020; Elydrissi Dep. 93:20-95:13, APP 3114; Flores Dep. 35:23-36:6, APP 3125; Hernandez Dep. 17:8-15, APP 319; Martinez Dep. 63:15-64:5, APP 3312; Neal Dep. 31:4-17, APP 3367; 48:13-22, APP 3369; 85:7-9, APP 3376; Romero Dep. 45:2-10, APP 3460; Salamat-Talab Dep. 20:2-22, APP 3492; Stern Dep. 58:8-17, APP 3506; 59:9-16, APP 3506.

[46] Brenes Dep. 15:1-13, APP 3090; 26:1-25, APP 3091; 32:25-33:7, APP 3092-3093; 50:23-51:2. APP 3095; Flores Dep. 43:23-25, APP 3126; Neal Dep. 61:6-8, APP 3371; 85:3-6, APP 3376; Sabillon Dep. 30:13-21, APP 3471; 73:23-74:4, APP 3475; 89:11-90:5, APP 3476; Salamat-Talab Dep. 52:23-53:13, APP 3494-3495.

others only claim to have done so during isolated, limited, or discrete periods of time,[47] making their experiences disparate from the Named Plaintiffs. Also, dozens of class members have conclusively admitted that their pay records accurately reflect their work hours.[48] In each case, Defendants are entitled to raise these facts as defenses to individual claims. *See, e.g., Proctor*, 250 F.R.D. at 282 (decertifying where 10 percent of the deponents admitted never working off the clock; others claimed they remained clocked in but received incorrect paychecks; and others claimed recorded hours were paid at improper rates); *Basco*, 2004 WL 1497709 at *8 (identifying seven individualized defenses to "off the clock" claims that the defendant was entitled to show).

With respect to the "time-shaving" allegations, Defendants would be entitled to show that any changes to time records were made for legitimate, proper reasons, which include, among other possibilities, an employee's failure to clock out or correcting time entered under the wrong job code.[49] Accordingly, even if Plaintiffs propose that records will prove "time shaving" claims, Defendants are entitled to present rebuttal witnesses and evidence to refute any inference that time changes actually resulted in unpaid wage for hours worked. *See Hinojos v. Home Depot, Inc.*, 2006 WL 3712944, at *3 (D. Nev. Dec. 1, 2006) ("defendant would be entitled to contest whether […] improper time shaving occurred, […and] defendant would be entitled to show that any changes to time records were made for appropriate reasons").

Moreover, because any changes to time records were made at the store level by individual managers and not on a centralized basis, there is no "representative" evidence that

---

[47] Barron Dep. 11:8-19, APP 3013; 12:21-13:10, APP 3013; 21:19-24:1, APP 3015; Castaneda Dep. 47:4-9, APP 3106; M. Hernandez Dep. 24:6-25:19, APP 3192; Loma Dep. 38:14-16, APP 3300; Romero Dep. 62:10-64:1, APP 3463; M. Rodriguez Dep. 56:9-58:19, APP 3398; Elydrissi Dep. 105:4-106:22, APP 3155; Guerrero Dep. 48:14-49:6, APP 3185-3186; Stern Dep. 32:2-33:3, APP 3503-3504.
[48] Elliott Decl. ¶¶ 3-7, APP 0188-92 (deemed admissions to RFA No. 1).
[49] McAfee Decl. ¶ 13, APP 0005.

would uniformly prove or disprove "time-shaving" claims. After employees have recorded their clock-in/out time, managers can access those records and make necessary and legitimate changes, including: (1) reclassifying an employee's time when failing to clock in or clock out; (2) declaring tips received, if tips were not declared or an incorrect amount was declared; (3) correcting employee time recorded under the wrong job code; or (4) declaring an employee's weekly distribution from the tip pool.[50] For the sake of argument, even if a manager at one location made improper edits to time records, this would not show that other managers did or did not do the same thing, nor that the whole class was similarly affected.

An opt-in class cannot be similarly situated when it is "impossible to come up with a class-wide determination on liability" and individual determinations must be made. *Reich v. Homier Distrib. Co., Inc.*, 362 F. Supp. 2d 1009, 1013–14 (N.D. Ind. 2005); *see also Rindfleisch v. Gentiva Health Servs., Inc.*, 22 F. Supp. 3d 1295, 1303 (N.D. Ga. 2014) (citing *Reich* in holding same). Inevitably, here, because individual Opt-Ins show factual variability as to all aspects of alleged "off the clock" work, class-wide liability cannot be shown, and claims, instead, must be determined, individually in terms of:

- how many hours each person worked per week;

- whether any hours were worked off-the-clock, and if so, how many;

- whether time records were altered, and if so, whether the reason was valid;

- whether the claims implicate minimum wages, overtime, both or neither;

- whether minimum wages and overtime were properly paid or, if not, the damages.

Even if all the Named Plaintiffs (and/or some of the Opt-Ins) present anecdotal evidence that their time punches were modified or they worked off the clock to varying degrees, this is insufficient to represent evidence of a common experience by the whole class. Plaintiffs lack a

---

[50] McAfee Decl. ¶ 13, APP 005.

shred of evidence of any corporate scheme to require or encourage "off-the-clock" work or "shaving" of overtime such that <u>all</u> class members could be shown to be uniformly affected. Finally, Plaintiffs have no practicable means of addressing these specific factual questions with evidence as to all individuals.

       c.    <u>"Excessive sidework" claims rely on differing individual facts</u>

Plaintiffs allege that Defendants required "tipped employees" to engage in excessive non-tip eligible work in the form of "sidework" (which Plaintiffs sometimes allege to include the "cleaning" described above and sometimes not) while either "off-the-clock" or "on-the-clock" at the rate of $2.13 per hour.[51] The Department of Labor takes the position, adopted by several courts, that "employees who spend more than twenty percent of their time on general preparation and maintenance work cannot be considered tipped employees […] <u>for the amount of time doing general preparation and maintenance</u>." *Fast v. Applebee's Int'l, Inc.*, 2010 WL 816639, at *2 (W.D. Mo. Mar. 4, 2010) (emphasis added), *aff'd*, 638 F.3d 872 (8th Cir. 2011). "Sidework" is a restaurant industry term referring to an array of duties performed by servers and bartenders to facilitate guest service. However, not all so-called "sidework" is the equivalent of "general preparation and maintenance." Under FLSA regulations, servers may spend part of their time on tasks such as "cleaning, and setting tables, toasting bread, making coffee and occasionally washing dishes or glasses" at the same time they are paid "tip credit" rates. 29 C.F.R § 531.56(e). In the absence of determinations as to what specific tasks were performed and the amount of time required, a claim that an employee performed "excessive sidework" for $2.13 per hour is an opinion devoid of legal significance. However, discovery reveals varied tasks and amounts of

---

[51] Gomez Dep. 158:18-21, APP 3148; Dkt. No. 169, 3rd Amend Compl. ¶ 20 ("Plaintiffs and other tipped employees were and are still required to stay at least two hours during or after each shift to do deep cleaning […] either paid $2.13 per hour to perform these job functions […] or are forced to do the work off the clock.").

time that differ based on the individual, where they worked, and periods of employment:

- **Kevin Sabillon** estimates that his end-of-shift sidework (such as preparing silverware rolls), required 20 to 30 minutes at the Preston Forest Mi Cocina and 30 to 45 minutes at the Highland Park Mi Cocina.[52]

- **Javier Gomez**, a Named Plaintiff, testified that his post-closing work in the kitchen would take 40 minutes to an hour and involve removing containers, changing dressings, polishing stainless steel on the stove, drying and putting paper in tortilla holders, and washing cabinets.[53] But, since October 2014, Gomez concedes that all such "sidework" has been assigned to a "utility" employee and this is no longer done by servers.[54]

- **Christy Neal**, a server, testified that sidework required 15 to 30 minutes per shift, depending on the station she was assigned and whether it was a lunch or dinner shift.[55]

- **Abderrahmane Elydrissi**, a server, claims "sidework" took 20 to 30 minutes.[56]

- **Marixa Hernandez** testified that sidework took substantially different amounts of time when working at Taco Diner as compared with Mi Cocina—from 40 minutes to two hours at Taco Diner (varying upon different days of the week), but only about 30 minutes at Mi Cocina "because they have extra employees."[57]

Virtually every person offers a different rendition of facts related to "sidework/cleaning" and individuals identify varying nuances within their own experiences. There is no consistency from one person to the next, either as to the duties involved, the amount of time, or the wages paid.

The evidence adduced regarding experiences of the Opt-Ins related to "excessive sidework" in the form of "cleaning" are not the same as and do not uniformly align with Named Plaintiffs' allegations. Eight Opt-Ins admit in interrogatory answers that that any "cleaning" required fewer than two hours (and some as little as zero).[58] Opt-In depositions also revealed

---

[52] Sabillon Dep. 41:7-45:11, APP 3472; 47:11-48:25, APP 3473.
[53] Gomez Dep. 57:12-59:8, APP 3148.
[54] Gomez Dep. 54:6-9, APP 3147; 57:12-59:8, APP 3148; 70:13-16, APP 3151; 77:8-10, APP 3153; 178:23-179:5, APP 3178.
[55] Neal Dep. 69:6-71:16, APP 3373.
[56] Elydrissi Dep. 125:19-126:9, APP 3116.
[57] Hernandez Dep. 46:22-47:17, APP 3198.
[58] ROG #6: Browning, H. (35 to 40 minutes cleaning) APP 0259-260; Cruz, R. (hour and a half cleaning) APP 0285; Gonzalez, F. (15-30 minutes cleaning except "when the big bosses come") APP 0318; Keegan, H. (30 to 60 minutes cleaning) APP 0344; Martinez, I. (on a weekly basis, 5 to 7 hours cleaning) APP 0358; Rivera, J. ("45 minutes or

testimony highly inconsistent with the Named Plaintiffs' "cleaning" alleged, the amount of time required (if any), or being forced to perform it while "off-the-clock,"[59] and, importantly, for 43 Opt-Ins served with written discovery, it is conclusively established that they did <u>not</u> perform two or more hours of cleaning duties at the end of every shift.[60]

Additionally, some class members' testimony contradicts characterizations made by others. For example, Kevin Barron, a busser, testified that bussers were among the last employees to leave the restaurant at night, and that <u>all</u> servers were generally gone within <u>one hour</u> of the restaurant's closing.[61] Barron's testimony is inconsistent with claims that servers remained working for two to three hours "deep cleaning" after closing. Barron denies seeing servers engaged in "deep cleaning," such as cleaning the walls or drains, because this is a task he performed during his shift.[62] Inconsistent testimony among class members cannot be reconciled collectively. At the least, it shows that the experience of the Named Plaintiffs differed from employees in other positions, at other restaurants, or at other periods of time and that they are not "representative" of others.

      d.      <u>"Excessive sidework" allegations are subject to individual defenses</u>

Plaintiffs' "sidework" claims are inappropriate for collective treatment for substantially many of the same reasons as already discussed with "off-the-clock" claims—only with even more individual defenses. In addition, hostesses (and many class members working under other job codes paying more than minimum wage) have no "tip credit" taken, regardless of the duties

---

more cleaning after a dinner shift"); Salamat-Talab (post-shift cleaning not required) APP 0418; Valdez, Oliverio (60 to 90 minutes cleaning during a dinner shift) APP 0446.

[59] Alcaraz Dep. 40:21-41:1, APP 3007; Barron Dep. 9:15-17, APP 3013; 11:8-19, APP 3013; Brenes Dep. 26:1-25, APP 3091; Castaneda Dep. 36:21-38:17, APP 3103; Elydrissi Dep. 53:20-55:17, APP 3110; Neal Dep. 34:10-14, APP 3368; 73:2-74:4, APP 98:18-25; M. Rodriguez Dep. 42:7-9, APP 3394; 46:8-11, APP 3395;  47:8-10, APP 3395; Salamat-Talab Dep. 50:13-18, APP 3494; 67:24-68:11, APP 3498.

[60] Elliott Decl. ¶¶ 3-7, APP 0188-92 (deemed admissions to RFA No. 1).

[61] Barron Dep. 38:25-39:13, APP 3019.

[62] Barron Dep. 37:25-38:16, APP 3019; 62:16-18, APP 3021; 63:19-21, APP 3021.

involved,[63] such that the issue of sidework is not germane to them. In short, there are no common facts that would tie "excessive sidework" claims together across the whole class.

Tip credit can only be lost for "sidework" after consideration of the specific tasks performed by an individual and the amount of time at issue. 29 C.F.R. § 531.56(e); *Fast*, 2010 WL 816639, at *2. There is no generalized, representative basis upon which to evaluate these claims because the total weekly hours worked, quantity and nature of "sidework" tasks, and the associated compensation paid, are facts that vary widely. *See Mathis v. Darden Rests.*, 2014 WL 4428171, at *4 (S.D. Fla. Sept. 1, 2014). In *Mathis*, servers and bartenders alleged that they worked "off-the-clock" and were subject to "excessive sidework." *Id.* There, the court found that the class differed "significantly in terms of hours worked, type of work performed, [and] amount of compensation [and] subjection to a tip-credit rate[.]" *Id.* As in *Mathis*, the defenses "will turn upon those distinctions." *Id.* (holding that these issues "cannot be generalized [because] the majority of material issues underlying the available defenses are highly individualized."). *Id.*

Given the variances in individual experiences, "cleaning" or "sidework" is not an issue that can be tried by extrapolation, and there is no expert testimony. In *Mathis*, the court implicitly rejected the "extrapolation methods proposed by Plaintiffs' expert[.]" *Id.* at *5. Here, Plaintiffs are in an even worse position than the plaintiffs in *Mathis* because they do not have an expert proposing any "extrapolation methods" that could be considered. With 301 class members, sifting through the data and testimony to undertake a person-by-person, week-by-week, task-by-task analysis and accounting of alleged "sidework" hours and then of wages paid is unrealistic and unmanageable.

In addition, Defendants cannot be expected to establish a "representative" defense.

---

[63] McAfee Decl. ¶ 9-11, APP 0004-5; ¶19, APP 0010.

*Johnson v. Big Lots Stores, Inc.*, 561 F. Supp. 2d 567, 587 (E.D. La. 2008) (a defendant "cannot

be expected to come up with 'representative' proof when the plaintiffs cannot reasonably be said

to be representative of each other.").   Defendants are entitled to make individual defenses to

"sidework" claims, such as: (1) Opt-Ins did not perform tasks unrelated to their tipped work as

servers, such as "preparation and general maintenance" because when the only "sidework" is

preparing rolls of silverware or making coffee, and cleaning tables, those are functions clearly

related to serving guests and can be paid at the "tip credit" rate. *See Schaefer v. Walker Bros.*

*Enterps.*, 829 F.3d 551, 554–55 (7th Cir. 2016) (holding that it was "untenable" to argue that

servers' making of coffee, cleaning tables, and ensuring that strawberries are spread on waffles

were tasks unrelated to tipped work); (2) Opt-Ins were rarely or never working as servers and did

not perform these types of tasks at all, as admitted by some of the Opt-Ins deposed;  (3) even if

"general preparation" tasks were performed, they did not exceed 20 percent of the individuals'

time; (4) regardless of the tasks or percent of time, the person was paid an average hourly rate

greater than minimum wage and not subject to a tip-credit rate. For example, hostesses and other

job codes have never been subject to tip-credit rates and bussers were paid $7.25 per hour or

more for time spent as "cleaners."

> **2.** **Plaintiffs' "tip credit" allegations are divergent, do not apply at all to many class members, and have limited application to other class members**

>> a.   Disparate employment circumstance make the Named Plaintiffs' "tip credit" claims unrepresentative of the class

There are material factual differences among the class resulting from a myriad of

different compensation systems. One of Plaintiffs' central complaints is that they were denied

minimum wages because the "tip credit" was taken improperly. More specifically, Plaintiffs

complain servers were paid $2.13 per hour while contributing to tip pools benefitting "ineligible"

employees, which if true, would result in the improper use of "tip credit" during weeks when it occurred.[64] But this claim is also not common to the class, for many reasons. First, many Opt-Ins never worked as servers, did so only on isolated occasions, or only during discrete period(s) of their employment.[65] Further, many Opt-Ins cannot claim "tip credit" because, by their own admission (as well as Defendants' records), they were never paid a regular hourly wage that was less than the minimum wage.[66]

To illustrate the point that some class members worked only sporadic, isolated shifts in any of the five "tipped" job codes subject to this suit (servers, bussers, hostesses, cocktail waitresses, or bartenders), pay records show that over a 104-week period between 2012 and 2014, Opt-In Myriam Flores recorded fewer than 12 total hours as a hostess, and zero as a server, bartender, or busser.[67] The rest of Flores' thousands of work hours during those two years were recorded under and paid for job codes not at issue in this lawsuit. Similarly, Opt-In Teresa Salamat-Talab recorded only about 80 hours in a tipped job code (hostess) throughout her entire one year of employment and recorded no time as server, bartender, or busser.[68] Salamat-Talab recorded the vast majority of her time under "cashier" or "food runner" job codes, which are neither subject to "tip credit" rates of pay nor participation in a "tip pool."[69]

And, to further illustrate, the different factual settings regarding payment at a rate less than minimum wage, only three of the 19 deposed Opt-Ins (Felipe Herrera, Isidoro Martinez, and Mike Stern) were paid rates less than minimum wage at all times (before tips). Even among this

---

[64] Dkt. No. 169, Pltf.'s 3d Am. Compl. ¶ 23-24.
[65] Alcaraz Dep. 21:18-22:24, APP 3003; Guerrero Dep. 12:15-22, APP 183; M. Rodriguez Dep. 12:1-12, APP 3391; Salamat-Talab Dep. 51:2-7, APP 3494; Flores Dep. 28:15-29:9, APP 3123; Castaneda Dep. 7:16-9:10, APP 3099; Barron Dep. 8:14-23, APP 3012; Roberts Dep. 11:22-14:13, APP 3380; J. Romero Dep. 12:2-13, APP 3455.
[66] Flores Dep. 29:21-30:4, APP 3124; Salamat-Talab Dep. 11:2-20, APP 3490; 13:1-10, APP 3491.
[67] Flores Pay records, APP 0783-0835 (August 10, 2012, and August 8, 2014); Flores time and attendance records, APP 2447-2474.
[68] Salamat-Talab Pay records, APP 2202-2226 (all); Salamat-Talab time and attendance records, APP 2965-2971.
[69] Salamat-Talab Pay records, APP 2202-2226 (all); Salamat-Talab time and attendance records, APP 2965-2971.

small group, compensation varied, as Felipe Herrera, a Mercury bartender, earned $6.00 per hour, plus tips, compared with $2.13 per hour for servers Martinez and Stern.[70] Six of 19 were never paid under the "$2.13/hour plus tips" system.[71] Maria Guerrero was paid $12.00 per hour, plus tips, as a hostess, and $6.00 per hour, plus tips, as a cocktail server at The Mercury.[72] And, finally, while most servers earned $2.13 per hour plus tips for their time recorded as "servers," those at the Mi Cocina-Chevy Chase (Maryland) location, received $3.63 per hour, plus tips.[73]

Because numerous class members worked across multiple job codes having multiple pay structures within the same workweek, any "tip credit" analysis necessitates complex inquiries to find the existence or amount of tip credit taken for each workweek for each individual. *See Johnson v. TGF Precision Haircutters, Inc.*, 2005 WL 1994286, at *5 (S.D. Tex. Aug. 17, 2005) (noting that the "complexity of individualized claims […] is only exacerbated by the variety of methods by which Plaintiffs were paid").[74]

With 300 class members multiplied by over 200 workweeks during the class period, it could take 60,000 individual analyses (200 workweeks times each class member) just to figure out which class members were paid less than an average rate of $7.25 per hour, how much less, and for which workweeks. Such evaluations would not be conclusive of minimum wage liability but, rather, would only rule out liability on an individual or workweek basis. Plaintiffs have no expert witness offering any such analysis, and no practicable way of introducing any classwide proof. Individualized complexities regarding "tip credit" do not stop with the challenge of

---

[70] Herrera Dep. 13:25-14:5, APP 3202; 15:17-19, APP 3202; 64:21-65:2, APP (Deposed Opt-In pay records),;500-549, APP 0566-1235, APP 1260-1423, APP 1429-1533, APP 1640-1656, APP 1702-2353; McAfee Decl. ¶ 17, APP 0009-10.
[71] Opt-In Pay Records, APP 0500-2353.
[72] M. Guerrero Pay Records APP 0971-998.
[73] Elydrissi Dep. 53:1-11, APP 3110.
[74] Again, to illustrate the variations and complexities, two deposed Opt-Ins, Teresa Salamat-Talab and Myriam Flores each recorded zero hours in any "tip credit" job codes for the entire period of August 2011 through December 31, 2015.  *See* T. Salamat-Talab pay records, APP 2202-2226; M. Flores pay records, APP 0758-868.

evaluating time and pay records because Plaintiffs also dispute the accuracy of time records. However, Plaintiffs cannot offer any common evidence to show how many hours each person actually worked; thus, any resolution will be an inherently individual one.

**Tip credit and improper tip pooling.** There is no evidence of a systematic, unlawful tip pooling practice to which all employees were subject. Differing employment facts also make the class dissimilar to the Named Plaintiffs in regard to these "tip pooling" claims. Most Opt-Ins have no knowledge, beyond pure speculation, that any employee other than a busser, hostess, or bartender ever received money from their tip pools.[75] In general, only servers have customarily contributed money to tip pools.[76] For every given workweek, class members either contributed to tip pools, received money from tip pools, contributed to and received money from tip pools, or did not participate in a pool at all—and their participation or lack thereof could change weekly. These are material distinctions making "tip pooling" claims individually unique.

>   b.   "Tip credit" disparities give rise to individualized defenses to minimum wage claims

There can be no "minimum wage" violation where an employee's total weekly wages— on the average—exceed $7.25 for all hours actually worked. *U.S. v. Klinghoffer Bros. Realty Corp.*, 285 F.2d 487, 490 (2d Cir. 1960); *Monahan v. Cty. of Chesterfield*, 95 F.3d 1263, 1280 (4th Cir. 1996); *Monger v. Cactus Salon & Spa's, LLC*, 2009 WL 1916386, at *1 (E.D.N.Y. July 6, 2009) ("It does not matter that an employee is required to work 'off-the-clock' [...] if her pay for the entire week is sufficient to maintain the statutory hourly rate when averaged over all the

---

[75] Alcaraz Dep. 17:4-23, APP 3002; Alcaraz Dep. 20:25-21:11, APP 3002-03; Barron Dep. 27:8-21, APP 3016; Brenes Dep. 34:9-13, APP 3093; Castaneda Dep. 40:14-23, APP 3104; Elydrissi Dep. 79:3-22, APP 3112; Flores Dep. 34:9-17, APP 3125; Flores Dep. 55:18-21, APP 3128, Flores Dep. 61:7-10, APP 3130; Flores Dep. 73:17-20, APP 3132; Hernandez Dep. 37:20-38:10, APP 3196; Loma Dep. 47:15-22, APP 3301; Neal Dep. 56:6-9, APP 3370; Neal Dep. 83:14-17, APP 3375; Roberts Dep. 48:5-20, APP 3386; M. Rodriguez Dep. 45:14-17, APP 3395; M. Rodriguez Dep. 96:6-11, APP 3402; Valdez Dep. 42:23-43:19, APP 3510..

[76] McAfee Decl. ¶¶ 11, 14, 17, APP 0005-08; Barron Dep. 11:1-7, APP 3013; Castaneda Dep. 29:23-25, APP 3102; Loma Dep. 17:19-25, APP 3298

hours worked."). Thus, while the question of whether a "tip pool" included an "ineligible employee" is one that may be material to some class members' claims, it would not be relevant to those working only as hostesses, expos, dishwashers, cooks, cashiers and/or some other job category not subject to tip-credit rates in any given workweek. *See Trejo v. Ryman Hosp. Props., Inc.*, 795 F.3d 442, 448 (4th Cir. 2015) (affirming denial of recovery of "lost tips" because no "tip credit" was taken and thus minimum wages were not at issue).

Likewise, tip-pooling and tip credit issues are immaterial to those employees who did not participate in a tip pool. Whether any class member participated in a tip pool during any given workweek is a fact that cannot be established through representative evidence, and numerous Opt-Ins have worked in job codes outside of the tip pooling systems (*e.g.*, Cooks, Dishwashers, Expos, Cashiers, and To-Go Handlers). Some Opt-Ins admit that they were <u>always</u> paid a regular hourly rate at or above $7.25 per hour.[77] For others, the analysis is not simple, because for each person and for each workweek, the total hours worked and total wages paid must be ascertained to determine if the average wage for the workweek was less than the statutory minimum.

Because differing pay systems impact whether an FLSA violation could have occurred in a given workweek, as well as the nature of the violation, <u>some</u> of the individualized defenses available against <u>each</u> Plaintiff and for <u>each</u> workweek as to "tip credit" claims include: (1) the plaintiff did not work in a tip-credit job; (2) the plaintiff's rate of pay applicable to each job worked and total wages paid were greater than minimum wage; (3) the employee did not contribute to or receive money from a tip pool and, thus, has no claim based on ineligible employees; (4) all members of a tip pool in a specific workweek or location were eligible tipped

---

[77] Flores Dep. 29:21-30:4, APP 3124; Salamat-Talab Dep. 11:2-20, APP 3490; Salamat-Talab Dep.13:1-10 APP 3491.

employees. The answers to these numerous key inquiries will differ from Plaintiff to Plaintiff, with some having no possible "tip pool" claims, meaning the class cannot be considered "similarly situated." *See Rindfleisch*, 22 F. Supp. 3d at 1304 (decertifying class because common proof could not establish liability to individuals).

Defendants' policy is that managers are not tip pool participants.[78] On the other hand, Plaintiffs' implication that a contrary, unwritten policy exists is only supported by conclusory or speculative allegations that "managers" or "ineligible employees" must have taken part of pooled tips. This is not a common thread and has no value as evidence (representative or otherwise). Unlike at the conditional certification stage, Plaintiffs' burden at this stage requires them to demonstrate fair, representative and admissible proof of the claims. As such, even if Plaintiffs were to point to evidence that a particular "manager" received tip pool money on a particular week at a specific restaurant, it could not be reasonably extrapolated that the same thing occurred at every restaurant since August 2011.

Because there is no "policy" to pay managers from tip pools, determining whether any restaurant's pool included an "ineligible employee" becomes an even more granular inquiry. The FLSA requires only that minimum wages not be kicked back to "employers." *See* 29 C.F.R. § 531.35. However, the "employer" designation does not attach to every person having supervisory responsibilities. *See Rudy v. Consol. Rest. Cos., Inc*., 2010 WL 3565418, at *5 (N.D. Tex. Aug. 18, 2010) ("The designation 'employer' under the FLSA does not automatically accompany supervisory responsibility or the designation 'manager[.]'"); *Dole v. Cont'l Cuisine, Inc*., 751 F. Supp. 799, 803 (E.D. Ark. 1990) (holding *maître d'* not an "employer" under FLSA); *Strange v. Wade*, 2010 WL 3522410, at *7 (S.D. Ohio Sept. 8, 2010) (holding that manager's status as

---

[78] McAfee Decl. ¶12, APP 0005; ¶ ¶14-15; APP 0005-6 (example tip distribution records).

"employer" depended on hiring and firing authority and "how much control" the manager exercised). Factors requiring consideration as to whether a "manager" is an "employer" under the FLSA include whether he or she: (1) has actual authority to hire and fire employees; (2) supervised and controlled employees' work schedules or conditions of employment; (3) determined the rate and method of payment; and (4) maintained employment records. *Rudy*, 2010 WL 3565418, at *6.

Plaintiffs have no evidence of any job titles systematically receiving tip pool money other than the job codes already in the class, and Plaintiffs do not dispute that these are "tipped employees." As a result, there is no way to determine, collectively, that supposedly "ineligible" employees either received tip pool money or that facts support their argument that the unknown individuals were actually "employers" as defined under the FLSA, rather than "tipped employees." Plaintiffs have no knowledge or objective proof of any "manager" receiving money from tip pools, much less evidence of a "company policy," or even an experience common to the class, making this claim non-triable as a class issue.[79]

**Credit card fees.** Finally, Plaintiffs' contention that servers were charged excessive "credit card transaction fees" deducted from their tips is subject to numerous individual defenses. First, the existence and amount of such fees varied by location—ranging from "none" at The Mercury, to 1.5% of credit card tips at four Mi Cocina locations (for the entire period), to 2.0%

---

[79] *See* Elliott Decl. ¶¶ 3-7, APP 0188-92. (deemed admissions to RFA No. 4); Opt-Ins' Answers to Interrogatory #4: Alvarado, APP 227-228; Brown, APP 254-255; Browning, APP 0259; Castaneda, APP, 271-272; Coronado, APP 0278-279; Cruz, APP 0284 ; Flores, APP 0304; Gaytan, APP 0310; Gonzalez, APP 0317; Keegan, APP 0343; Martinez, APP 0356-57; Reveles, APP 0390-91; Rivera, APP 0398; Roberts, APP 0404; Salamat-Talab, APP 0416-17; Stanert, APP 0431-32; Valdez, APP 0455-56; and Valles, APP 0457; Alcaraz Dep. 17:4-23, APP 3002; Alcaraz Dep. 20:25-21:11, APP 3002-03; Barron Dep. 27:8-10, APP 3016; Brenes Dep. 34:9-13, APP 3093; Castaneda Dep. 40:14-23, APP 3104; Elydrissi Dep. 79:3-22, APP 3112; Flores Dep. 34:9-17, APP 3125; Flores Dep. 55:18-21, APP 3128; Flores Dep. 61:7-10, APP 3130; Flores Dep. 73:17-20, APP 3132; Hernandez Dep. 37:20-38:10, APP 3196; Loma Dep. 47:15-22, APP 3301; Neal Dep. 56:6-9, APP 3370; Neal Dep. 83:14-17, APP 3375; Roberts Dep. 48:5-20, APP 3386; M. Rodriguez Dep. 45:14-17, APP 3395; M. Rodriguez Dep. 96:6-11, APP 3402; Valdez Dep. 42:23-43:19, APP 3510.

at each other Taco Diner and Mi Cocina location (for part of the relevant time period), as well as a further reduction of the percentage in 2014, such that the highest percentage became 1.5%.[80] As a result, servers in the class are factually disparate based on where they worked and when. Third, employees without customer tickets (hostesses, bussers and others) did not have "credit card tips" and, as such, did not reimburse the restaurants for any credit card transaction fees.[81] Fourth, the "tip credit" issue is relevant only to class members paid tip-credit rates. Again, no common experience ties the whole class together.

Defendants can further show that the recovery of processing costs for credit card tips is not an FLSA violation because the employers' recovery of those costs does not exceed the actual costs of liquidating credit card tips into employee cash. *See Myers v. The Copper Cellar Corp*, 192 F.3d 546, 554 (6th Cir. 1999) (Tipped employees are only "entitled to receive "the cash proceeds of the charged tip[s] *net of liquidation expenses,*" and employers can recover these fees so long as they are not more than "total expenditures associated with credit card tip collections.") (emphasis in original). Here, the processing expense Defendants incurred between 2011 and 2015 was always at least 2.02% or greater, while the employee reimbursement rate never exceeded 2.0% at any location and never exceeded 1.5% at others.[82] Thus, no class member should have a claim. Notwithstanding, servers who were not subject to any recovery of credit card processing fees at The Mercury cannot have a claim based on a policy that only applied at Mi Cocina and Taco Diner restaurants. As with every other claim, the alleged unlawful "transaction fee" policy was not an experience common to the whole class, thus making a uniform disposition inappropriate.

---

[80] McAfee Decl. ¶ 38, APP 0016.
[81] McAfee Decl. ¶ 36, APP 0017.
[82] McAfee Decl. ¶¶ 37-38, APP 0016-17.

### 3.     Discovery shows factual disparity as to "overtime" and "minimum wages"

a.     <u>The Named Plaintiffs' claims differ from many Opt-Ins who have worked little or no overtime, or have always been paid minimum wage</u>

The Named Plaintiffs each contend that they regularly worked overtime for which they were not compensated each week, but this differs from the experience of many class members who—by their own admission—worked part time and rarely or never had overtime hours. Among the 19 Opt-Ins deposed, the majority of the deponents testified to facts inconsistent with unpaid overtime, either for all of their employment, or for most workweeks. Kevin Barron testified that he usually worked **35 to 38 hours**, had overtime no more than two or three weeks per year and <u>was paid</u> for the overtime.[83] Seth Brenes always work **less than 40 hours** during his entire employment, and the number of hours worked varied—from **30 to 40** per week during the first three months and **13 to 24** per week during the final three months.[84] Abderrahmane Elydrissi worked a "maximum" of **20 to 25 hours**.[85] Myriam Flores believes there were but a "few occasions" would work more than 40 hours during busier times, such as November and December, but otherwise, about **35 hours** per week.[86] Marixa Hernandez claims to have worked between **40 and 50** hours per week when she worked at Taco Diner, but only **20 to 30 hours** per week when she worked at Mi Cocina.[87] Angel Loma typically worked five days a week for between 5 and 7 hours per shift (**25 to 35 hours** per week).[88] Isidoro Martinez calculates his weekly work hours as:  "It's easy. It's five days. Five [hours] times five is **25 [hours]**."[89] Christy

---

[83] Barron Dep. 12:1-3, APP 3013; 42:10-14 APP 3020.
[84] Brenes Dep. 51:3-8, APP 3095.
[85] Elydrissi Dep. 93:20-95:13, APP 3114.
[86] Flores Dep. 35:23-36:6, APP 3125.
[87] Hernandez Dep. 17:8-15, APP 3191.
[88] Loma Dep. 34:1-11, APP 3299.
[89] Martinez Dep. 63:15-64:5, APP 3312.

Neal admits she was a part-time employee and believes she worked **20 to 40 hours** per week.[90]

Jeimmy Romero stated that she generally worked for two hours four times (**8 hours**) per week

and has never worked 40 or more hours in a week.[91] Teresa Salamat-Talab agreed that there was

a four-month period at the end of her employment where she worked only 10 to 35 hours per pay

period (**5 to 17.5 hours** per week) and did not work much because she "had another job."[92] Mike

Stern testified that he worked "closer to **35**" **hours** per week and "nobody worked 40 hours[.]."[93]

There is no common experience with overtime, particularly in comparison with the Named

Plaintiffs' contentions that they worked, at differing times, weekly hours in the ranges of "50 to

60," "50 to 55," "55 to 60" and "60 to 65."[94]

Individual, self-serving recollections of hours worked are all the evidence Plaintiffs have.

All are subject to cross-examination, credibility determinations, and rebuttal evidence from other

witnesses and employment records. The evidence fails to demonstrate any common experience

as to employees' hours worked or the existence of "overtime," much less on an "unpaid" basis.

Individual variation in hours worked, both above and below the overtime threshold, is a material

fact distinction that supports decertification. *See Proctor*, 250 F.R.D. at 282-83.

> b.   Differences in hours worked and pay rates lead to individualized defenses

Defendants have individual defenses to overtime claims when certain class members

concede that they did not work overtime hours. *See Rindfleisch*, 22 F. Supp. 3d at 1303

(decertifying, in part, because "some Plaintiffs did not actually work overtime hours, and thus

"the issue of liability is not susceptible to common proof"). For purposes of a similarly situated

---

[90] Neal Dep. 31:4-17, APP 3367; 48:13-22, APP 3369; 85:7-9, APP 3376.
[91] Romero Dep. 45:2-10, APP 3460.
[92] Salamat-Talab Dep. 20:2-22, APP 3492.
[93] Stern Dep. 58:8-17, APP 3056; 59:9-16, APP 3506.
[94] Bobadilla Dep. 16:11-15, APP 3027; Gomez Dep. 78:15-24, APP 3153; Huerta Dep. 56:1-7, APP 3232; Merino Dep. 33:25-34:13, APP 3324; U. Rodriguez Dep. 40:14-41:3, APP 3414.

inquiry, there cannot be a "more pertinent disparate factual setting" than where some individuals

facially lack a claim. *Id.* Furthermore, in the absence of representative evidence to establish the

amount of unpaid overtime worked by all class members, individual inquiries are necessary:

"*Mount Clemens* requires the plaintiff in a falsified records case to present a prima facie case as

to the unpaid overtime hours and worked, "this burden <u>must be met individually by each plaintiff</u>

in a case such as this where differing work situations make pattern evidence unpersuasive."

*Murray v. Stuckey's Inc.*, 939 F.2d 614, 621 (8th Cir. 1991) (emphasis added); *Rindfleisch*, 22 F.

Supp. 3d at 1304 ("Rpresentative testimony regarding hours worked to determine an amount of

damages is inappropriate when the issue of liability […] is still in question in regards to certain

Plaintiffs"). Here, there is no "pattern evidence" as to hours worked, much less persuasive

pattern evidence. Facts pertaining to overtime are all individual.

**4.    Discovery reveals no "improper deductions," much less a systematic practice causing classwide FLSA violations**

a.    <u>Most Opt-Ins deny ever having any "deductions" taken</u>

Next, Plaintiffs allege that Defendants have a policy causing servers to pay out of their

tips for "dine and dash," "breakage," or "cash register shortages;" and, as a result, they are being

deprived of minimum wages for the weeks in which this occurred.[95] Because there is no part of

the FLSA that prohibits "deductions" from wages, "deductions," if any, would only represent an

FLSA violation if the ultimate <u>effect</u> of the deduction was to drop the employee's average hourly

pay below the statutory minimum for the week. *See Pullen v. McDonald's Corp.*, 2014 WL

4610296, at *2 (E.D. Mich. Sept. 15, 2014) (noting that policy of deducting cost of uniforms

from wages did not make the class similarly situated because "[d]epending upon the hours

---

[95] *See* Dkt. No. 169 3rd Amended Compl. ¶ 21 ("Defendants have a policy of deducting from Plaintiffs' and other tipped employees' daily earned cash tips, customer walk outs ("dine and dash"), breakage, or register shortages causing Plaintiffs to earn less than minimum wage)

DEFENDANTS' MOTION FOR DECERTIFICATION OF CONDITIONALLY CERTIFIED COLLECTIVE ACTION AND BRIEF IN SUPPORT

worked per week, the deduction for uniforms may or may not have dropped their average hourly pay to such an extent that it would violate the FLSA").

Discovery shows "improper deductions" to be a very uncommon experience, if any experience at all. In fact, 28 Opt-Ins have affirmatively admitted in answers to interrogatories and requests for admissions that they were <u>not</u> subject to any deduction from wages or tips for "dine and dash," "breakage," or "cash register shortages," and an additional 22 Opt-Ins are deemed to have admitted the same thing.[96] Among the 14 deposed Opt-Ins who worked as servers, all but one denies having ever experienced a deductions from their tips for a "dine and dash" incident and some concede that when their customers "dined and dashed" it <u>did not</u> result in a deduction.[97] Five other deposed Opt-Ins were never servers, but concur that they were not subject to deductions.[98] Similarly, no deposed class member asserted that he or she had ever paid for a broken item, at the same time that the vast majority admit to having broken things at work.[99] Others not deposed also admitted having broken items at work without any deduction.[100]

---

[96] Elliott Decl. ¶¶ 3-7, APP 0188-92 (deemed admissions to RFA No. 3); Opt-Ins Answers to Interrogatory No. 3: Bonilla Romero, APP 0248; Novy,  APP 0375; Alvarado, APP 0227; Barron, APP 0242; Escobedo, APP 0299; Flores, APP 0304; Keegan, APP 0343; Neal, APP 0368; Romero, APP 0411; Sanchez, APP 0423; Hernandez, APP 0331; Rivera, APP 0397; Guerrero, APP 0323; Alarcon, APP 0217; Knox, APP 0348-49; Aguilar, APP 0198; Aguinaga, APP 0206; Urrieta, APP 0439; Ayala, APP 0234; Nwaohia, APP 0383; Vera, APP 0464; Valenciano, APP 0451; Browning, APP 0254; Elydrissi, APP 0293; Reveles, APP 0390; Roberts, APP 0403; Salamat-Talab, APP 0416.

[97] Alcaraz Dep. 32:9-12, APP 3005; Brenes Dep. 29:5-12, APP 3092; 61:5-15, APP 3096; Castaneda Dep. 41:19-43:5, APP 3105; Elydrissi Dep. 73:21-74:14, APP 3111; Guerrero Dep. 52:17-53:17, APP 3186; M. Hernandez Dep. 29:9-12, APP 3194; 30:1-3, APP 3194; Neal Dep. 55:3-6, APP 3370; Roberts Dep. 71:18-21, APP 3387; M. Rodriguez Dep. 70:8-71:20, APP 3400; Romero Dep. 73:13-25, APP 3466; Sabillon Dep. 96:5-15, APP 3477; 117:8-13, APP 3479; Stern Dep. 40:13-16, APP 3505; Valdez Dep. 40:15-41:3, APP 3509.

[98] Flores Dep. 54:25-55:9, APP 3128; Flores Answer to Request for Admission No. 3; APP 0304; Loma Dep. 46:17-47:7, APP 3301; Herrera Dep. 30:4-7, APP 3206; Barron Dep. 32:20-33:8, APP 3017-3018; Salamat-Talab Answer to Request for Admission No. 3, APP 0416.

[99] Alcaraz Dep. 32:6-8, APP 3005; Barron Dep. 32:24-33:1, 3017-3018; Brenes Dep. 29:13-20, APP 3092; Castaneda Dep. 41:19-43:5, 3105; Elydrissi Dep. 73:7-13, APP 3111; Flores Dep. 51:22-52:4 APP 3127; Guerrero Dep. 51:19-52:2, APP 3186; M. Hernandez Dep. 28:24-29:8, APP 3193-3194; Herrera Dep. 29:23-30:3, 3194; Loma Dep. 46:17-47:7, APP 3301; Martinez Dep. 34:4-23, APP 3307;  Neal Dep. 54:17-55:2, APP 3370; Roberts Dep. 44:18-45:3 3385, 71:22-72:1, APP 3387; M. Rodriguez Dep. 66:24-67:14, APP 3399; Romero Dep. 64:17-65:7, APP 3463-3464; Sabillon Dep. 92:11-93:1 APP 3476-3477; Salamat-Talab 59:7-9, APP 3496; Stern Dep. 40:6-12, APP 3505; Valdez Answer to Interrogatory No. 3, APP 0445; Bobadilla Dep. 184:17-24, APP 3069;

As to cash shortages, 15 of the Opt-Ins deposed admitted that they had paid for cash shortages, and two others claim that they had to pay for cash shortages, but only when working as cashiers, but not when working as servers.[101] As nearly all Opt-Ins who were deposed or answered discovery admit they were never subject to "deductions," this claim cannot support a class.[102]

      b.    <u>Even if haphazard "deductions" occurred, defenses are still individualized</u>

Plaintiffs have developed no evidence of any specific deduction being taken during any specific workweek as to any class member. The absence of this evidence represents a threshold failure of the claim *per se*. But, even if *ad hoc* evidence existed, Defendants would be permitted to defend it with evidence that (1) no deduction occurred; and (2) that the employee's wages for that week, even assuming a deduction occurred, did not result in an FLSA violation.

**5.    "Improper notice" of intent to take tip credits cannot be decided collectively**

      a.    <u>Facts regarding "notice" are inconsistent and individualized</u>

Another variation of Plaintiffs' "tip credit" claim is that they were not given proper

---

Gomez Dep. 125:24-126:7, APP 3165; Huerta Dep.160:16-161:2, APP 3258-3259; Merino Dep. 129:12-19, APP 3348; U. Rodriguez Dep. 110:16-111:4, APP 3432.

[100] *See, e.g.*, M. Releves Answer to Request for Admission No. 3, APP 0390.

[101] Alcaraz Dep. 32:13-33:15, APP 3005; Barron Dep. 33:2-4, APP 3018; Brenes Dep. 29:21-30:5, APP 3092; Castaneda Dep. 42:1-8, APP 3105; Elydrissi Dep. 74:8-11, APP 3111; Elydrissi Answer to Request for Admission No. 3, APP 0293; Flores Answer to Request for Admission No. 3, APP 0304; Guerrero Dep. 52:6-12, APP 3186; Hernandez Dep. 29:13-17, APP 3194; Loma Dep. 46:17-47:7, APP 3301; Martinez Dep. 39:19-40:17, APP 3308; Neal Dep. 55:7-19, APP 3370; Roberts Dep. 45:25-46:3, APP 3386, 72:2-6, APP 3387; M. Rodriguez Dep. 67:15-69:7, APP 3399; Salamat-Talab Dep. 59:10-60:4, APP 3496; M. Rodriguez Dep. 67:15-69:7, APP 3399; Romero Dep. 67:2-68:10, APP 3464.

[102] Alcaraz Dep. 32:9-12, APP 3005; Barron Dep. 32:20-33:8, APP 3017-3018; Brenes Dep. 29:5-12, APP 3092; 61:5-15, APP 3096; Castaneda Dep. 41:19-43:5, APP 3105; Elydrissi Dep. 73:21-74:14, APP 3111; Flores Dep. 54:25-55:9, APP 3128; Flores Answer to Request for Admission No. 3, APP 0304; Guerrero Dep. 52:17-53:17, APP 3186; M. Hernandez Dep. 29:9-12, APP3194;  30:1-3, APP 3194; Neal Dep. 55:3-6, APP 3370; Roberts Dep. 71:18-21, APP 3387 ; M. Rodriguez Dep. 70:8-71:20, APP 3400; Romero Dep. 73:13-25, APP 3466; Sabillon Dep. 96:5-15, APP 3477; 117:8-13, APP 3479; Stern Dep. 40:13-16, APP 3505; Valdez Dep. 40:15-41:3, APP 3509; Loma Dep. 46:17-47:7, APP 3301; Herrera Dep. 30:4-6, APP 3206; Salamat-Talab Answer to Request for Admission No. 3, APP 0416; *See, e.g.*, Opt-Ins' Answers to Request for Admission No. 3: T. Salamat-Talab: ("Plaintiff was employed as cashier, expo, and hostess during her employment […]. Therefore, this question is not applicable."); M. Reveles: APP 0390("Plaintiff states that she never had a customer walkout during the relevant time period in this case so this question does not apply to her"); M. Ayala: APP 0234(admitting no deductions were taken or that the policy "did not apply" to him.); H. Keegan (same).

"notice" of Defendants' tip credit under Section 203(m) of the FLSA. Notice requirements are extremely minimal and rely on facts that differ among class members. A court in this District has held that "[e]xplaining that an employee would make $2.15/hour plus tips and that they would participate in a tip pool has been determined to be sufficient notice under Section 203(m)." *Rudy*, 2010 WL 3565418, at *9 (granting summary judgment to restaurant and dismissing waiters' claims for improper "tip credit"); *see also Kilgore v. Outback Steakhouse*, 160 F.3d 294, 298 (6th Cir. 1998) ("[A]n employer must provide notice to the employees, but need not necessarily 'explain' the tip credit . . .."); *Ide v. Neighborhood Rest. Ptnrs., LLC*, 32 F. Supp. 3d 1285, 1293 (N.D. Ga. 2014) (holding that Department of Labor Wage and Hour posters provide adequate notice); *Pellon v. Bus. Representation Int'l, Inc.*, 528 F. Supp. 2d 1306, 1311-12 (S.D. Fla. 2007), *aff'd*, 2008 U.S. App. LEXIS 19077 (11th Cir. Sept. 3, 2008); *Schaefer*, 829 F.3d at 558 (affirming summary judgment on "lack of notice" claim and asking, "[i]f posters don't count [as adequate notice], what's the point of requiring them?").

Various Opt-Ins concede that they were told they would be paid an hourly rate plus tips; that they knew they were required to participate in a tip pool; and that they reviewed federal posters in the restaurant containing written notice about the "tip credit."[103] That the Named Plaintiffs claim not to have personally received similar notice is not "representative" evidence of a fact that can be extrapolated across the class. Moreover, the issue of "notice" is only relevant to class members subject to tip-credit rates, and, thus, it necessarily excludes certain Opt-Ins.

   b. <u>Individual defenses rebut Plaintiffs' "lack of tip credit notice" claims</u>

The mere fact that some individuals deny being provided with notice of the tip credit is merely that—an individual fact. If this claim were to be tried, Defendants should be entitled to

---

[103] Brenes Dep. 9:17-10:5, APP 3089; Stern Dep. 25:19-26:25, APP 3502; Sabillon Dep. Ex. 2 at ¶ 22, APP 3487.

call each individual to testify (and to rebut their testimony, if necessary) about whether (1) they were subject to tip-credit wages, such that notice would be required under Section 203(m); and (2) whether he or she, in fact, received notice. The issue cannot be determined collectively, or by anecdotal evidence, and there exists no proper "representative" evidence.

### 6.    Alleged timing issues create factual disparities and individualized defenses

#### a.    Timing of alleged violations varies among class members

There is an inherent contradiction between the testimony of the Named Plaintiffs and other class members based on the timing of the allegations. The Named Plaintiffs admit that the alleged unlawful conduct ceased "after the suit was filed," but the class also includes Opt-Ins hired after the suit was filed.[104] Plaintiffs, therefore, are not representative of several Opt-Ins hired near or after the lawsuit was filed (August 2014), or who assert violations occurring since then. Opt-In Keith Espinoza's first shift occurred in 2015, three others (Israel Galvan, Joseph Daniels, and Brandon Alvarez) began work during or after August 2014, two others (Christy Neal and Jesus Gomez) started work the month before the lawsuit was filed.[105] Thus, there is no basis to ascribe the Named Plaintiffs' pre-suit experiences to the post-suit experiences of any of the Opt-Ins, or vice versa.

There are other factual differences based on time that vary among other Opt-Ins. Some long-term employees cannot recall if the alleged violations happened within the past five years. For example, Myriam Flores believes her check was short by one hour on one occasion, but does

---

[104] Merino Dep. 37:10-21, APP 3325; 72:9-24, APP 3333; Gomez Dep. 45:25-46:7, APP 3145; 101:23-102:7; APP 3159; Bobadilla Dep. 72:10-73:2, APP 3041; 74:2-18, APP 3042.

[105] Galvan Time & Attendance Records, APP 2475; Daniels Time & Attendance Records, APP 2435; Alvarez Time & Attendance Records, APP 2370; Neal Time & Attendance Records, APP 2780; Gomez Time & Attendance Records, APP 2507.

not recall if this occurred after August 2011.[106] Maria Alcaraz believes managers received money from tip pools at some point, but cannot testify that this occurred at any time since August 2011.[107] Oliverio Valdez claims that there were "two or three times" in the distant past that managers received tips, but he is not aware of any such events happening since August 2011.[108] Angel Loma testified that he has not worked off-the-clock during the last three to four years.[109] Discovery has easily shown that there is no factual consistency among Plaintiffs—not only as to the question of "whether" there were violations, but also "when."

       b.     <u>Timing issues give rise to individualized defenses</u>

Because the Named Plaintiffs have testified that the alleged wrongdoing ceased shortly after this lawsuit was filed, they have conceded effectively that policies and practices about which they complain ceased after August 2014.[110] However, not every individual in this class worked during the period of time before August 2014. Because the Named Plaintiffs disavow their claims post-August 2014, they are not representative of those purporting to have claims after that date, creating conflict between the class and its putative representatives, necessitating individualized defenses to all of them. There are only two possibilities:  if the Named Plaintiffs were representative of the class, no class member would have a valid claim post-August 2014. Conversely, if Opt-Ins have valid post-August 2014 claims, the Named Plaintiffs' testimony is non-representative, and this issue is not subject to class determination.

       **7.**     **Rare actions surviving decertification are distinguishable**

There are comparatively few district court opinions where decertification was not

---

[106] Flores Dep. 55:22-57:16, APP 3128;  66:19-25, APP 3131.
[107] Alcaraz Dep. 17:4-23, APP 3002.
[108] Valdez Dep. 42:23-43:19, APP 3510.
[109] Loma Dep. 38:14-16, APP 3300.
[110] Merino Dep. 37:10-21, APP 3325; 72:9-24, APP 3333; Gomez Dep. 45:25-46:7, APP 3145; 101:23-102:7, APP 3159; Bobadilla Dep. 72:10-73:2, APP 3041; 74:2-18, APP 3042.

ordered, but in those rare instances where decertification was not ordered, it is apparent that the issues were narrow, discrete and contained substantially more uniformity than they do here. Plaintiffs may argue, wrongly, that collective treatment is supported by the non-precedential decision in *Falcon v. Starbucks*, 580 F. Supp. 2d 528 (S.D. Tex. 2008). There, a district court declined to decertify the claims of Starbucks assistant store managers who claimed they were forced to work "off-the-clock." *Id.* at 541.

Material facts that distinguish *Falcon* are abundant, including: (1) the court in *Falcon* found "that Starbucks' [had a] general policy of requiring ASMs to perform job duties that could not easily be completed within 40 hours while, at the same time, strongly discouraging overtime[,]" *Id.* at 536; along with (2) "significant evidence [...] that <u>all</u> of the opt-ins either worked off-the-clock or had time shaved off of their hours by Store Managers . . .." *Id.* at (emphasis added). This is not a finding that could be made here as numerous class members admit both that the hours in their pay records are accurate and that they did not work off the clock;[111] (3) *Falcon* included <u>consistent</u> testimony from all persons deposed, *id.* at 537; whereas here, the only consistency in the deponents' testimony is the variation; (4) the employees in *Falcon* "were, by default, scheduled for 40 hours a week" and discovery showed that <u>all</u> class members worked overtime, so only overtime claims were presented. *Id.* at 530. Here, there is no common experience of 40-hour schedules or uniform performance of overtime. (5) The assistant manager position in *Falcon* had recently been reclassified from "exempt" to "non-exempt" across-the-board, a fact not applicable here, *id.* at 530; and (6) no complicating "tip credit" issue is found in *Falcon*, whereas here, the tip credit issue applies to some class members and not

---

[111] Elliott Decl. RFA #1 (deemed admissions); Brenes Dep. 15:1-13, APP 3090;  26:1-25, APP 3091; 32:25-33:7, APP 3092-3091; 50:23-51:2, APP 3095; Flores Dep. 43:23-25, APP 3126; Neal Dep. 61:6-8, APP 3371; 85:3-6; APP 3376; Sabillon Dep. 30:13-21, APP 3471; 73:23-74:4, APP 3475; 89:11-90:5, APP 3476; Salamat-Talab Dep. 52:23-53:13, APP 3494-3495.

DEFENDANTS' MOTION FOR DECERTIFICATION OF CONDITIONALLY CERTIFIED COLLECTIVE          Page -39-
ACTION AND BRIEF IN SUPPORT

others on a week-by-week basis. In the absence of any "general policy," a lack of evidence that scheduling is uniform and overtime is universally worked while "strongly discouraged," and abundant evidence of different experiences among class members, *Falcon* is unpersuasive.[112]

Fundamentally, *Falcon* was a much simpler collective action that is distinguishable from this case and the many others that have been decertified. Notably, *Falcon* concerned only one job title (assistant manager), compared with five job titles here; one restaurant concept (Starbucks Coffee), compared with three here; and one system of compensation (hourly pay); compared with numerous systems of pay here. While *Falcon* is distinguishable on many factual grounds, the *Proctor* decision from this District; the *Roussell* opinions affirmed by the Fifth Circuit, as well as the on-point *Mathis* opinion provide a more factually apposite and persuasive framework for decertifying this collective action. *Proctor*, 250 F.R.D. at 282-83 (decertifying off-the-clock overtime action where facts and defenses were too individualized); *Roussell v. Brinker Int'l, Inc.*, 2009 WL 6496504 at *3 (S.D. Tex. Jan. 26, 2009) (partially granting second decertification motion narrowing "tip pooling" collective action class to only opt-ins deposed), *aff'd* by 441 F. App'x 222 (5th Cir. 2011); *Mathis*, 2014 WL 4428171, at *1, 6 (decertifying "off-the-clock" and "tip credit" collective action claims).

**8.    Manager-specific allegations of conduct contrary to an employer's policy means the class members are not connected in a uniform way**

Plaintiffs' allegations do not rest on proof of a "centralized" corporate policy—written or unwritten—because there is no evidence that any exists. Evidence is not "representative" where it "shows that a handful of managers have committed possible FLSA violations in a variety of different ways[.]" *Salinas v. O'Reilly Auto., Inc.*, 2005 WL 37835986, at *6 (N.D. Tex. Nov. 17,

---

[112] *See* § III.B.3.a, *supra* (Opt-Ins estimate of hours worked); Castaneda Dep. 40:11-13, APP 3014; Flores Dep. 36:3-10, APP 3125; A. Huerta Dep. 197:14-18, APP 3268; Loma Dep. 59:17-20; APP 3302; Roberts Dep. 39:25-40:2, APP 3384; Sabillon Dep. 102:4-103:13, APP 3478; Salamat-Talab Dep. 19:18-20:1, APP 3492.

2005) (denying motion for certification overtime claims based on unpaid performance of off-the-clock after-hours tasks); *Roussell v. Brinker Int'l, Inc.*, 2008 WL 7835721, at *2 (S.D. Tex. Sept. 30, 2008) (decertifying in part, and finding that whether class members were "coerced by managers" at different stores could not be determined collectively); *Proctor*, 250 F.R.D. at 283 (decertifying where "claims vary from store to store and manager to manager"); *Johnson v. TGF Precision Haircutters, Inc.*, 2005 WL 1994286, at *4 (S.D. Tex. Aug. 17, 2005) (decertifying where evidence showed "prima facie claims for FLSA violations at different times, in different places, in different ways, and to differing degrees"). Where a "lawsuit involves critical questions of fact that vary from plaintiff to plaintiff and restaurant to restaurant," decertification is the only proper result. *Roussell*, 2008 WL 7835721 at *2.

Here, many Opt-Ins admit that the alleged violations only occurred under certain managers or locations, as is clearly illustrated by their deposition testimony:

- **Angel Loma** testified that his "off-the-clock" allegations consisted of occasions where he clocked out at the end of a shift, and then was asked to perform additional work before leaving. But he admits that some managers instructed him to clock back in before resuming work, and some managers did not.[113]

- **Jeimmy Romero** testified that she never performed "deep cleaning" at the Mi Cocina-West Village location but that when she worked at the Bent Tree location, any "deep cleaning" varied depending upon which manager was on duty.[114]

- **Matthew Castaneda**, although admitting that he was offering nothing but speculation, stated that after a particular manager left, "and another manager started taking care of the tips, my tips were coming up bigger."[115]

- **Marixa Hernandez** testified that sometimes she would do her sidework while on the clock, other times while off the clock, and that it would depend on which manager was on duty at the end of the shift.[116]

---

[113] Loma Dep. 36:18-38:10, APP 3299.
[114] Romero Dep. 24:24-26:13, APP 3457-3458; 31:15-19, APP 3459.
[115] Castaneda Dep. 40:17:23, APP 3104; 41:5-17, APP 3105.
[116] M. Hernandez Dep. 32:7-33:21, APP 3194.

- **Maria Rodriguez** claims that on fewer than ten occasions at Preston Forest Mi Cocina, she was told to clock out and keep working if she was getting close to 40 hours, but she was <u>not</u> told to do this when she worked at Mi Cocina Rockwall.[117] Elizabeth Romero testified that some managers required her to pay for "dine and dash" occurrences, while others did not.[118]

With admissions that any alleged violations were specific to certain managers, the conclusion that the class is not similarly situated is further supported.

**C.**      **There is No Fair or Procedurally Proper Way to Try This Action on a Collective Basis Without Violating Defendants' Due Process Rights**

**1.**      **"Representative" evidence is unavailable to determine liability or damages**

Because Plaintiffs have no evidence of an express policy or practice that resulted in FLSA violations experienced by the whole class, they can only attempt to argue that a jury may extrapolate facts applicable to the class after being presented with "for example" testimony from individuals. To the contrary, unrepresentative "examples" will only highlight the differences in terms of claims, facts and defenses, which differences make collective treatment unmanageable and improper. The Fifth Circuit has recognized, under analogous circumstances, that there are "substantive due process concerns" and a "lack of fundamental fairness" related to "a system that permits the extinguishment of claims or the imposition of liability in nearly 3,000 cases based upon results of a trial of a non-representative sample of plaintiffs." *In re Chevron U.S.A., Inc.,* 109 F.3d 1016, 1020 (1997); *see also Prise v. Alderwoods Grp. Inc.*, 817 F. Supp. 2d 651, 681 (W.D. Pa. 2011) (decertifying five-count collective action because the evidence did not sufficiently "implicate the existence of a single decision, policy or plan implemented on a corporate-wide basis that similarly affected plaintiffs"); *Big Lots*, 561 F. Supp. 2d at 586 (noting that representative proof was problematic where "for every instance in which an opt-in plaintiff

---

[117] M. Rodriguez Dep. 27:18-31:24, APP 3392.
[118] Romero Dep. 70:5-72:4, APP 3465.

reported that she hired subordinates, there is an alternative response to the contrary" and where witness' testimony "strongly suggests that ASMs are properly classified […] there are other witnesses who will testify to the contrary").

As shown here, some class members have no "off-the-clock" claims, while others admit that any such claims only pertains to actions many years ago, only under the direction of specific managers at different locations, or only for certain periods of time. Some Opt-Ins plainly have no "overtime" claim based on their admitted part-time schedules, and many others concede that the number of hours they worked varied considerably from one week to the next. Some have no "tip credit" claim for a variety of reasons, including the fact that they either did not participate in a tip pool or participated in a tip pool but still earned a regular hourly rate greater than $7.25 per hour at all times. Some cannot have a "sidework" claim for many of the same reasons, and among those who purport to have such a claim, the nature, scope and extent of it varies dramatically. Some admit to having been given appropriate tip credit "notice," but others argue to the contrary. Nearly all Opt-Ins admit no "deduction" claim applies to them (much less do Plaintiffs have any way to show a loss of minimum wages for any workweek). On the one hand, the Named Plaintiffs testified that the alleged violations prompting this lawsuit ceased shortly after the lawsuit was filed.[119] But on the other hand, some class members were not even wokring until after this lawsuit was filed.

Just as to the most basic matter of the number of hours each person worked, there is no classwide or representative evidence supporting Plaintiffs' claims. When "pattern evidence [is] unpersuasive," the burden to prove unpaid overtime hours is individual to each Plaintiff. *Murray*,

---

[119] Merino Dep. 37:10-21, APP 3325; 72:9-24, APP 3333; Gomez Dep. 45:25-46:7, APP 3145; 101:23-102:7, APP 3341; Bobadilla Dep. 72:10-73:2, APP 3041; 74:2-18, APP 3042.

DEFENDANTS' MOTION FOR DECERTIFICATION OF CONDITIONALLY CERTIFIED COLLECTIVE ACTION AND BRIEF IN SUPPORT

939 F.2d at 621. Here, the "pattern evidence" as to hours worked is not just "unpersuasive," it is non-existent. Plaintiffs have no expert witnesses and no lay witnesses with knowledge beyond their own personal circumstances.

Testimony from every class member is not available because individualized discovery has been strictly limited. Further, nearly half of the class members noticed for depositions refused to appear, raising serious doubts about the likelihood of broad participation at trial.[120] In any event, collective actions are not supposed to give way to an individual free-for-all. And, even if classwide testimony was possible, it would be unrealistic for a factfinder to be expected to absorb, track and decide the myriad of material individual facts. *See, e.g., Reed v. Cty. of Orange*, 266 F.R.D. 446, 463 (C.D. Cal. 2010) (decertifying and noting that attempting to try varied "pre-shift, post-shift, missed meal break and 'other' claims together would not preserve significant judicial resources, it would deplete them"); *Reyes v. Tex. Ezpawn, L.P.*, 2007 WL 101808, at *4 (S.D. Tex. Jan. 8, 2007) (rejecting plaintiffs' attempt to "gloss over the many differences in the factual and employment settings at each store"); *Desilva v. N. Shore-Long Island Jewish Health Sys., Inc.*, 27 F. Supp. 3d 313, 317–18 (E.D.N.Y. 2014) (decertifying where plaintiffs "work or worked in a wide variety of departments at a vast array of locations and held a diverse collection of positions [. . . where] job duties differed and their compensation—or lack thereof—for overtime work […] differed accordingly"). For the sake of argument, even if Plaintiffs were determined (and had the ability) to elicit testimony from all class members, Defendants would be unfairly prejudiced at such a trial because of their inability during the discovery period to obtain any discovery, much less substantial discovery, as to the vast majority

---

[120] Elliott Decl. ¶ 8, APP 0192-93. Defendants noticed depositions for Opt-Ins who did not appear: Anayeli Sanchez, Jose Gaytan, Haile Keegan, Heidi Knox, Jose Morales, Victor Valles, Pedro Alvarez, Brenda Escobedo, William Kifer, Destiny Saucedo, Adan Reyes, Luis Urrutia, Kandy Galvan, Juan Mendez, and Alfredo Posadas.

of testifying Opt-Ins. *See Big Lots*, 561 F. Supp. 2d at 586 ("[D]efendant's inability to cross-examine the vast majority of the opt-in plaintiffs was prejudicial.")

"The remedial purposes of the [FLSA] do not justify proceeding collectively in a case that involves as many disparate circumstances as this one." *Roussell*, 2008 WL 7835721, at *2. Although a collective action would be inefficient regardless to the amount claimed, the Named Plaintiffs each assert individual damages ranging between $109,000 and $153,000, plus attorneys' fees,[121] so this is not an example of a case of aggregating miniscule claims in order to enable them to be worthy of litigating.

### 2. An "all or nothing" outcome will inevitably deny justice to the deserving, or award relief to the undeserving

By its very nature, a collective action inevitably results in "all-or-nothing liability for large groups of employees[.]" *Mathis*, 2014 WL 4428171, at *6. However, when individual employees are shown to have dissimilar working conditions and dissimilar claims, the "all-or-nothing" format necessarily results in a distortion of justice. A "ruling on the merits [is] fundamentally unfair to both sides . . . [when done] on the basis of proof that is not representative of the whole class." *Big Lots*, 561 F. Supp. 2d at 588 (decertifying where the evidence showed defendants likely to be liable to some class members but "the Court cannot simply pluck out" the ones with meritorious claims). Here, the Opt-Ins "would not receive recoveries based on their individual experiences [but, rather], they would be grouped with other Opt-In Plaintiffs' and receive either windfalls or insufficient recoveries." *Mathis*, 2014 WL 4428171 at *5. Once it has been demonstrated that there are "too many material dissimilarities between Opt-Ins Plaintiffs' employment circumstances in terms of job titles, job locations, tip-

---

[121] *See* APP 0469-498, Named Pltfs.' Amended Answers to Defendants' Second Set of Interrogatories.

credit rates, off-the-clock policies, and managerial conduct […] it is not more practical, efficient, or fair to proceed as a collective action." *Id*.

### 3.    No trial plan—much less a manageable one—is workable and fair

Although Defendants have only obtained discovery from a small fraction of the class, there is no principled basis to conclude that either the Named Plaintiffs or any of the other discovery respondents are "representative" of each other. Plaintiffs have not—nor can they— propose a plan for representative testimony that would not prejudicially impact Defendants' right to defend the claims of each class member. Given the lack of uniformity as to their testimony and the individual defenses applicable to every claim, the only practicable means by which Defendants can defend these claims is to tediously pick the class apart, person by person, in a manner that is both confusing, inefficient, and prejudicial. *See Big Lots*, 561 F. Supp. 2d at 586 (holding that where a defendant must "pick the class apart, plaintiff by plaintiff, going into the day-to-day job duties of each" it "is the antithesis of a collective action").

"There cannot be representative evidence and testimony where the plaintiff was not subject to the same policy as the collective class." *White v. 14051 Manchester Inc.*, 301 F.R.D. 368, 375 (E.D. Mo. 2014) (decertifying tip-pooling collective action where the named plaintiffs "stated that they were required to share their tips with non-tipped employees during every shift . . . [but this] was not the experience of most of the opt-in plaintiffs"). Presenting purportedly "representative" testimony is procedurally unfair where there is no consistency among the class members, no evidence of a consistently applied policy, the amount of unpaid time at issue is not uniform or of a pre-determined duration, and the evidence is anecdotal. *Proctor*, 250 F.R.D. at 284. Because individual experiences differ, and those differences matter, there is no "shortcut" to trying the claims individually, rather than collectively.

Here, as in *Proctor*, there are no "alternative ways to try the case or any ways to address the disparate factual allegations of the [301] Plaintiffs." *Id.* at 283; *see also Wilson v. Navika Capital Grp. Inc.*, 2014 WL 2534904, at *6 (S.D. Tex. June 4, 2014) (decertifying collective action where plaintiffs did not offer any "method for using representative testimony from a limited number of the remaining Plaintiffs" but rather asked the court, "[i]n essence […] to allow the case to proceed as 42 'mini-trials'"); *Espenscheid v. DirectSat USA, LLC*, 706 F.3d 770, 774 (7th Cir. 2013) (affirming decertification where plaintiffs could not show how 42 purportedly class members were actually "representative" of others as to each claimed violation).

"[C]oherent management of the trial and avoidance of jury confusion are essential considerations." *Sargent v. HG Staffing, LLC*, 171 F. Supp. 3d 1063, 1083 (D. Nev. 2016) (decertifying "off the clock" action where factual disparities would require testimony as to each employee's work activities). Minimally, before a district court allows an FLSA action to proceed to a collective action trial, there must be "a workable trial plan under which it is reasonable to believe that the representative testimony of the testifying witnesses is similar to the rest of the non-testifying Plaintiffs." *See Navika Capital Grp.*, 2014 WL 2534904, at *2. Furthermore, if a plaintiff class "cannot show that it is possible to fairly determine whether and to what extent the Plaintiffs have been undercompensated on a class or sub-class-wide basis," then decertification must follow. *Id.* It is not the purpose of a collective action to ask a jury to parse out all of these individual distinctions and, in essence, adjudicate hundreds of claims separately. *Big Lots*, 561 F. Supp. 2d at 574 ("[T]he more dissimilar plaintiffs are and the more individuated Big Lots' defenses are, the greater doubts there are about the fairness of a ruling on the merits—for either side—that is reached on the basis of purportedly representative evidence.") Here, Plaintiffs must show how a representative trial can be had, and their inability to do so dooms this case as a

collective action.

Because Plaintiffs have no expert testimony, they may attempt to resurrect an attorney-generated 600+ page "summary" that purports to summarize thousands of time and pay records and offers the conclusions of counsel as to the amount of minimum wages owed to each class member. Plaintiffs' damages "summary," first disclosed to Defendants with the filing of Plaintiffs' summary judgment motion, is not expert testimony—or even evidence that could be admissible at trial, for reasons that have already been briefed to the Court.[122] There is no way for Plaintiffs to present their chart  or claimed damages nor is there anyone who can testify or be cross-examined about it. To the extent Plaintiffs oppose decertification by offering their "summary" chart as evidence, Defendants will renew their objections. A summary of alleged damages is not, moreover, the equivalent of a trial plan or evidence of liability on a classwide basis. At most, it is Plaintiffs' counsel's formulation of opinions; and, thus, it does not come close to meeting Plaintiffs' burden of show that a fair representative action can be had.

Decertification of this case compares favorably to a collective action restaurant case affirmed by the Fifth Circuit. *Roussell*, 2009 WL 6496504, at *4. There, the court originally certified a class of over 3,500 servers, only to later decertify it as to all except the handful of individuals deposed in discovery. *Id.* Unlike here, only servers were at issue in *Roussell,* and the only matter at issue was whether improper "tip pools" resulted from the undisputed inclusion of employees known as "QAs." *Id*. at *2. *Roussell* was, in substance, narrower and less complex than the one here. The <u>only</u> substantive question of liability or damages presented to the jury in *Roussell* was whether the job duties performed by "QAs" qualified them as "tipped employees"

---

[122] *See* Dkt. No. 481, Defendants' Objections to and Motion to Strike Plaintiffs' "Summary" Evidence, Damages Computations, and Other Evidence Filed in Support of Plaintiffs' Motion for Partial Summary Judgment.

eligible to systematically participate in a tip pool—every other material fact was stipulated by the parties. *Id*. at *2. Despite the very narrow inquiry, that court could not try the case on a representative basis. By contrast, Plaintiffs represent multiple categories of employees, the three different restaurant brands, and the assertion of eight different kinds of alleged FLSA violations, and within each of those, a variety of different factual permutations and alleged damages or the lack thereof. Unlike in *Roussell*, virtually nothing is stipulated, and everything is disputed.

In *Roussell*, repeated attempts to formulate a workable collective trial plan failed: "under any of Plaintiffs' proposed trial arrangements, there are hundreds, if not thousands, of individualized claims that would have to be adjudicated should the jury find that QAs are not eligible to participate in a tip pool." *Roussell*, 2009 WL 6496504 at *4. Ultimately, at trial, the jury was presented with evidence from all remaining class members. *Roussell,* 441 F. App'x at 227 (noting that the jury "heard evidence regarding a total of 25 plaintiffs . . . [and] deposition excerpts on the remaining 30"). While *Roussell* represents a comparatively small collective action, limited to only one narrow factual issue, and no reliance on "representative" evidence, this case attempts to sweep in too many different kinds of employees with too many different individual claims, issues, and distinguishing facts. The class must inevitably collapse under its own weight. This case is due to be decertified.

## IV.    CONCLUSION

Defendants respectfully move the Court to decertify the conditionally certified class, to dismiss all Opt-Ins, and grant Defendants all other relief to which they are entitled.

Dated: November 18, 2016.                    Respectfully Submitted,

                                             _/s/ Ann Marie Painter_
                                             Ann Marie Painter
                                             *Attorney-in-Charge*
                                             State Bar No. 00784715
                                             AMPainter@perkinscoie.com
                                             Jason R. Elliott
                                             State Bar No. 24050558
                                             jelliott@perkinscoie.com

                                             **PERKINS COIE LLP**
                                             500 N. Akard, Suite 3300
                                             Dallas, TX 75201
                                             Telephone: 214.965.7000
                                             Facsimile: 214.965.7799

                                             ATTORNEYS FOR DEFENDANTS

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the above and foregoing has been served upon all counsel of record via the Court's CM/ECF system, on this 18th day of November, 2016, as follows:

Caroline Ibironke
Rhoda P. Appiah-Boateng
AI LEGAL GROUP, PLLC
6060 N. Central Expressway Suite 560
Dallas, Texas 75206

                                             _/s/ Ann Marie Painter_
                                             Ann Marie Painter

130211779.12